## STATE OF CONNECTICUT *v.* CAROL TOMASKO
## (SC 15499)

Berdon, Norcott, Katz, Palmer and Peters, Js.

Argued June 3—officially released August 19, 1997

*David J. Laudano*, with whom, on the brief, was *Raymond W. Ganim*, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *Jonathan C. Benedict*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Carol Tomasko, appeals[1] from the trial court's denial of her motion for a new trial[2] following the judgment of guilty of murder rendered against her after a jury trial.[3] The defendant claimed that she was entitled to a new trial because: (1) during jury deliberations, one or more jurors improperly had considered information contained in a newspaper article regarding the trial proceedings; and (2) the state had withheld exculpatory evidence in violation of *Brady* v.

---

[1] The defendant has appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] The defendant filed her original motion for a new trial on October 20, 1995. She subsequently filed an amended motion for a new trial on November 21, 1995. All references herein to the motion are to the amended motion for a new trial.

[3] The defendant filed her motion for a new trial while her appeal from her murder conviction was pending. We affirmed the defendant's murder conviction; see *State* v. *Tomasko*, 238 Conn. 253, 681 A.2d 922 (1996); shortly after the trial court had rendered its decision on the defendant's new trial motion.

*Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). After a hearing, the trial court denied the defendant's motion. We conclude that the trial court properly rejected the defendant's claims and, accordingly, we affirm the trial court's judgment.

## I

The defendant first contends that the trial court improperly rejected her claim that her conviction of murder[4] was tainted because jurors had discussed a

---

[4] The defendant was convicted of the murder of the victim, her husband, George Sabol. The facts underlying the defendant's conviction are summarized in *State* v. *Tomasko*, 238 Conn. 253, 255–56, 681 A.2d 922 (1996). "On September 14, 1981, the defendant lived in Stratford with [the victim], and her daughter, Suzette Meyer. The defendant and the victim shared a history of marital strife. On the night of the murder, the defendant and the victim were arguing because the victim had been arrested for driving an unregistered motor vehicle, and the victim had accused the defendant of having informed the police. In the course of the argument, the defendant threw a beer bottle at the victim, who had been drinking. Meyer, who was sitting at the kitchen table across from the victim, was looking down when she heard a loud noise. When Meyer looked up, she saw that the defendant was standing near the doorway holding a small handgun, and that the victim was slumped in his seat at the kitchen table. The victim died from a single gunshot wound to the back of the head.

"Although Meyer did not actually see the defendant pull the trigger, she testified that the defendant had been moving around during the course of the argument and, at one point, had entered Meyer's bedroom. Meyer and the victim's son both testified that the defendant customarily carried the handgun in her pocketbook, which she normally kept in Meyer's bedroom.

"After the shooting, the defendant held the gun to Meyer's head and told her to help clean up the blood from the floor. While Meyer was cleaning the floor, the defendant dragged the victim's body out the back door and into the yard. Meyer then assisted the defendant in lifting the victim's body into a pickup truck. Thereafter, the defendant, with Meyer as a passenger, began driving the pickup truck through Stratford. Because the truck developed mechanical problems, the defendant drove the truck to the house of her brother, Ellsworth Hull, where the engine stopped running. Hull, who never noticed the victim's body in the bed of the truck, was unable to jump start the vehicle. Hull then drove Meyer and the defendant home. Meyer never saw the victim's body again. One week later, Meyer learned that the victim's body had been found floating in Long Island Sound.

"Because Meyer feared for her life as a result of the defendant's threats, she did not tell the police about the incident until 1992. On September 2,

newspaper account of the trial proceedings during their deliberations. We disagree.

The following facts are relevant to our resolution of this issue. The jury began its deliberations in the defendant's trial on the afternoon of Tuesday, June 21, 1994. Deliberations continued until Monday, June 27, 1994, when the jury requested that the trial court reinstruct it on the principle of reasonable doubt and provide it with guidance on how to overcome an "impasse" that existed among its members.[5] The trial court, as requested, reinstructed the jury on reasonable doubt and, further, gave the jury a "Chip Smith" instruction.[6] Thereafter, the jury resumed deliberations and

1992, after reading an article in the local newspaper about the unsolved murder, Meyer told Hull, in whose home she was then living, about the murder. Meyer contacted the police that same day and implicated the defendant. After an investigation in which Meyer assisted the police, the defendant was arrested [charged and convicted of] murder." Id.

[5] The jury submitted a note to the trial court that provided in relevant part: "(1) Please give us a definition of a hung jury. Please be specific. How do we resolve our current impass[e].

"(2) Please explain reasonable doubt. We are having difficulty with the definition of reasonable doubt. . . ."

[6] "A 'Chip Smith' instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See *State* v. *Smith*, 49 Conn. 376 (1881); see also 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8." *State* v. *Sawyer*, 227 Conn. 566, 581 n.10, 630 A.2d 1064 (1993). The trial court gave the following "Chip Smith" instruction:

"Now, as to how you go about breaking an impasse, which is the other thing you wanted to know, I believe, let me just read to you what I have written.

"In the overall scheme of things, ladies and gentlemen, you still have not deliberated very long compared to some cases.

"So, I want to give you some further instructions.

"One of the most important policies behind our legal system is the bringing of finality to legal conflict, both civil and criminal.

"It's important both for the state and for the defendant who, without finality, continues to have charges hanging over her, with the expectation of future expenses for counsel fees.

"Everyone needs to know where they stand vis-a-vis the law.

"Because of th[is] need for finality, because a second trial may impose great hardship and expense on the parties, and perhaps more importantly, because there is no reason to believe that another jury will view the evidence more clearly or accurately than you can, the court wants you to make a

returned a guilty verdict on Tuesday, June 28, 1994.

At the hearing on the defendant's motion for a new trial, juror Robert Schmidt testified that during the

continued effort to see if you can resolve this case within the framework of the instructions already given.

"To help you, I want to give you some additional instructions.

"And I emphasize now, they are not to be coercive or to force a verdict that does violence to individual judgment. You cannot allow that.

"They are designed to help you consider your own positions and to weigh them against the positions of other jurors, and to help you reconsider individual conclusions in the light of contrary arguments.

"These instructions, as I noted, are additional to the prior instructions.

"They are not in lieu of the original instructions.

"And, as I told you, I will be happy to repeat any part of those prior instructions that you feel will help you.

"Up to now, ladies and gentleman, you have not been able to reach a unanimous verdict.

"I'm sure you realize that this is not the first time that this has occurred in the trial of a case.

"And under these circumstances when it becomes clear that you're having some difficulty, rather than terminating procedures, I want to give you some additional instructions and ask you to return and resume your deliberations.

"Now, although the verdict to which each juror agrees must, of course, be his or her own conclusion and not a mere acquiescence in the conclusions of his fellows, yet in order to bring twelve minds to a unanimous result, the jurors should examine with candor the questions submitted to them and with due regard and deference to the opinions of each other.

"In conferring together, the jury ought to pay proper respect to each other's opinions and listen with candor to each other's arguments.

"If much the larger number of the panel are for conviction, a dissenting juror should consider whether the doubt in his or her mind is a reasonable one, which makes no impression upon the minds of so many other men and women equally honest, equally intelligent, and who have heard the same evidence with the same attention and with equal desire to arrive at the truth, and out of the same sanction of the same oath.

"On the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the conclusion of a judgment which is not concurred in by most of those with whom they are associated on the jury, and distrust the weight or sufficiency of that evidence on which they rely, which fails to carry conviction in the minds of their fellows.

"I tell you this to get you to further consider the opinions of your fellow jurors in your deliberations.

"I ask you now to return to the jury room and to return to the task at hand which is to try to arrive at a verdict."

The defendant has not challenged the propriety of this instruction on appeal.

jury's deliberations on Friday, June 24, 1994, an unnamed juror stated that he had heard that the trial judge was preparing a "Chip Smith" instruction to give to the jury.[7] According to Schmidt, the jury had discussed the meaning of such an instruction for "the better half" of its deliberations on Friday. Schmidt characterized the jurors' conjecture regarding the meaning of the "Chip Smith" instruction as "basically incorrect."[8] Schmidt also testified, however, that he had understood the difference between the inaccurate information regarding the "Chip Smith" instruction that purportedly had been introduced to the jury by the unnamed juror, on the one hand, and the correct instruction subsequently given by the trial court, on the other. Furthermore, Schmidt acknowledged that his vote to convict the defendant had not been influenced by any premature discussions about the impending "Chip Smith" instruction.[9] Finally, Schmidt stated that he had been

---

[7] The fact that the trial court was considering giving the jury a "Chip Smith" instruction was contained in a local newspaper account of the trial proceedings. The brother of the unnamed juror allegedly had read the article and conveyed the information to that juror. The jury's alleged consideration of the newspaper account first came to the defendant's attention by virtue of a magazine article about the case in which Schmidt was identified as a holdout juror.

[8] In the trial court's memorandum of decision on the defendant's motion for a new trial, the court characterized Schmidt's testimony as indicating that the jurors, on the basis of the information provided to them by the unnamed juror, had speculated that the "Chip Smith" instruction "meant that the minority had to give in to the majority." The trial court further observed that the subject newspaper article, which had appeared in the Connecticut Post, "actually stated that the charge requested 'those in the minority to strongly consider [the] majority opinion.'"

[9] Schmidt testified in relevant part as follows:

"[Raymond W. Ganim, Defense Counsel]: All right. By the time that he voted on the case itself he had the correct information, it that—is that what's being said?

"The Court: You heard that.

"[Schmidt]: That's correct.

"The Court: That's correct.

"Mr. Ganim: And that you were making your decision based upon the information that was given in the Chip Smith charge, is that right?

the lone holdout both before and after the jurors' Friday morning discussion regarding the newspaper article, and that he did not change his vote until Tuesday.[10]

Merton Conley, the jury foreperson, also testified at the hearing. Conley stated that he could not recall any juror discussing a newspaper article about the trial. Moreover, Conley testified that he did not recall any discussions regarding the "Chip Smith" instruction on Friday, June 24, 1994, or at any other time prior to the "Chip Smith" instruction given by the trial court.

In its memorandum of decision on the defendant's motion, the trial court concluded that even if it assumed, arguendo, that Schmidt's testimony was completely accurate,[11] Schmidt had testified that "he understood [the court's 'Chip Smith'] charge, and also that the court's charge clearly showed that the previous speculation about what the charge might consist of was not accurate." The trial court further concluded that "Schmidt was the lone holdout before, during and after

"[Schmidt]: That's correct.

"Mr. Ganim: The correct one that was given to you by the judge, is that right?

"[Schmidt]: That's correct.

"Mr. Ganim: Rather than the incorrect information that was given when the individual juror came into the courtroom or into the jury room and indicated that there was going to be a Chip Smith charge, is that correct?

"[Schmidt]: That's correct."

[10] Schmidt testified in relevant part as follows:

"The Court: . . . . Is that a correct assumption, that the day before [the incorrect information was received], Thursday, it was eleven to one?

"[Schmidt]: That's correct.

"The Court: And it was still eleven to one on Friday?

"[Schmidt]: That's correct.

"The Court: And on Monday it was still eleven to one?

"[Schmidt]: That's correct.

"The Court: And then Tuesday it became twelve?

"[Schmidt]: That's correct."

[11] It is noteworthy that the trial court expressly found "Conley [to be] a believable witness" and, by contrast, assumed, arguendo, the accuracy of Schmidt's testimony.

these events. The other eleven jurors had already decided the defendant was guilty. It is impossible to see how the defendant's case was harmed in any way. No evidence entered the jury room—only foolish speculation which did not sway [Schmidt]—or anyone else. . . . [Furthermore], there is no doubt that the volunteered speculation about an impending 'Chip Smith' charge did not affect the defendant in any way. Schmidt made it clear [that] he recognized the differences between the speculation and the actual charge. He testified [that] he based his actions on the actual charge, not on the earlier comments about it. The court finds that the incident, such as it was, was not harmful to the defendant. Not only did it have no effect on any jurors, but any [effect] it might have had [was] quickly and totally dissipated when the court gave the correct charge. The court is satisfied, *beyond any reasonable doubt*, that the defendant could not be, and was not, prejudiced by what is alleged to have occurred. . . . To the degree that anyone might have been confused by erroneous information, the court's charge soon after gave the jury the proper information and quite successfully cleared the air. . . . [Thus, t]he incident in question did not in any way compromise [the defendant's] right to a fair trial." (Emphasis in original.)

Our review of the trial court's conclusion regarding the defendant's allegations of jury impropriety is guided by well established principles. "Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of juror misconduct will necessarily be fact specific. . . . It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them." *State* v. *Brown*, 235 Conn. 502, 531–32, 668 A.2d 1288 (1995). Furthermore, where "the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant

who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 628, 682 A.2d 972 (1996). In assessing whether a defendant has met this burden, we are mindful that "[d]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 87, 621 A.2d 728 (1993).

Applying these principles to the case before us, we conclude that the trial court properly rejected the defendant's claim of juror misconduct. The testimony adduced at the hearing on the defendant's motion for a new trial fully supports the trial court's express finding that even if one or more jurors had speculated about the nature of the impending "Chip Smith" instruction in accordance with Schmidt's testimony, no possible prejudice inured to the defendant as a result of any such speculation or discussion.[12] Accordingly, we reject

---

[12] The defendant also claims that the trial court unduly limited the scope of the inquiry into what effect, if any, the jury's purported improper speculation about the meaning of the "Chip Smith" instruction had on the verdict. Specifically, the defendant claims that the trial court improperly truncated the examination of Schmidt by refusing to allow questions regarding the actual thought processes of the jurors. Because the defendant failed to raise this claim in the trial court, we are not bound to consider it. Our review of the record, moreover, reveals that the trial court conducted Schmidt's examination in accordance with Practice Book § 871, which provides that "[u]pon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. Subject to these limitations, a juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached." Finally, Schmidt testified that his vote

the defendant's contention that she is entitled to a new trial on the basis of the information regarding the forthcoming "Chip Smith" instruction that the jury allegedly had considered during its deliberations.

## II

The defendant also claims that the state withheld exculpatory evidence from her in violation of the due process clauses of the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. See *Brady* v. *Maryland,* supra, 373 U.S. 83; *State* v. *Simms,* 201 Conn. 395, 405, 518 A.2d 35 (1986). Specifically, the defendant contends that the state improperly suppressed: (1) a police report allegedly containing information tending to exculpate the defendant; and (2) audiotapes of police interviews with Thomas Marra, who claimed that the state inspectors conducting the interviews had accused him of murdering the victim, George Sabol. We conclude that the trial court properly rejected the defendant's claims.

The following additional facts are relevant to our resolution of these claims. By letter dated May 12, 1995, Marra notified the defendant's counsel that inspectors from the Bridgeport state's attorney's office had accused Marra and another individual, James Kallman, of having murdered the victim.[13] According to Marra's letter, the

to convict the defendant was not influenced by any misunderstanding of the "Chip Smith" instruction. We, therefore, reject the defendant's claim.

[13] The text of Marra's letter provides in relevant part: "I have some information that might be able to help [the defendant] out with her case. I was interview[ed] in 1985, 1986 [and] 1990 by members of the state['s] attorney['s] office in Bridgeport regarding the murder of [the victim].

"Myself and James [Kallman], were both prime suspect[s] in that murder, as well as several other murders in the Bridgeport area. James [Kallman] is Mary Sabol['s] husband. Mary Sabol testif[ied] in this case for the state against [the defendant].

"The inspector at the time thought that [the victim] was Mary['s] brother ·instead of her father. Mary Sabol was also questioned by members of the state['s] attorney['s] office regarding her knowledge of [Kallman's] involvement in a number of other murders with me. Members of the state['s] attorney['s] offices [were] convince[d] that me and [Kallman] killed [the victim].

inspectors had made this accusation during the course of interviews with him several years prior to the defendant's arrest and trial. See footnote 13 of this opinion. The defendant, in her new trial, claimed that this information was exculpatory and, consequently, that the state's failure to disclose it required a new trial.[14]

Marra testified at the hearing on the defendant's new trial motion, along with his attorney, Frank Riccio, and John Solomon, formerly an inspector with the Bridgeport state's attorney's office. Marra indicated that, commencing in October, 1985, he had been interviewed on several occasions by Solomon and various other police officials about a number of subjects, and that during one or more of these interviews, Solomon had accused Marra of having murdered the victim.[15] Marra further

"In July, 1994, I was interview[ed] by a special homicide task force in N[ew] Y[ork] and a member of [the] federal street gang task force from [Connecticut] at the state police [barrack] in [Rhode Island] about some other unsolved murders in [the New York and] New Haven area, involving [Kallman] and myself. And I told these people that [the defendant] had nothing to do with the murder of [the victim], that [Kallman] and I committed this murder.

"I did not know that [the defendant] went to trial on this case until I heard it on the news, and [Kallman] told me that Mary testif[ied] in this case and he didn't let her out of his sight during the trial.

"Everything I told you in this letter can be verif[ied] and I'll take a [polygraph] test on this information [also]."

[14] Marra's May 12, 1995 letter includes the assertion that he had told New York and Connecticut law enforcement authorities that he and Kallman actually had murdered the victim. According to Marra's letter, he had provided this information to police authorities "[i]n July, 1994." See footnote 13 of this opinion. The defendant, however, was convicted of the murder in June, 1994, prior to the date Marra claims to have confessed to committing that crime himself. The defendant has not raised any claim on this appeal regarding Marra's purported confession to the murder in his May 12, 1995 letter. Furthermore, at the hearing on the defendant's motion for a new trial, Marra refused to answer the state's inquiries regarding his claimed involvement in the victim's murder, choosing instead to invoke his fifth amendment privilege against self-incrimination as to all such questions.

[15] Marra testified that "Solomon banged on the table [and said:] 'I know God damn well you killed [the victim]; I'm going to nail you for this crime; and we're going to give you the death penalty on all these murders.'"

testified that the police had indicated to him that they also suspected Kallman of the murder. Although he claimed that Solomon had accused him of the victim's murder, Marra acknowledged that Solomon and the other police interviewers never indicated that they had any evidence to support a claim that Marra had been involved in the crime.[16] Furthermore, Marra indicated that, in his view, the police, and Solomon in particular, suspected him of numerous crimes.[17] On cross-examination, the state introduced impeachment evidence establishing that Marra had been convicted of eighty-nine separate felony offenses, including murder, kidnapping, fraud, larceny, tampering with a witness, tampering with evidence, and hindering prosecution.[18]

Riccio, who testified that he was present during the police interviews of Marra, corroborated Marra's testimony that the police had accused Marra and Kallman of the victim's murder. Riccio also indicated, however, that Marra had been questioned about more than twenty homicides.

Solomon testified that he had interviewed Marra on several occasions regarding the victim's murder, as well as many other homicides. He denied ever having accused Marra of murdering the victim, however, and indicated that he was "certain that [Marra] was never accused of that murder; nor to this day [did] I . . . ever suspect he was involved in it." Solomon also indicated that Marra was not trustworthy because he had lied to Solomon "hundreds" of times.[19]

---

[16] Marra also acknowledged that, during these interviews, he neither admitted any involvement in the victim's murder nor implicated Kallman in that crime.

[17] As Marra put it, "[i]n . . . Solomon's eyes I was a suspect in shooting the pope back then."

[18] In its memorandum of decision, the trial court noted that Marra "is presently serving [a prison term of] one hundred twenty years for [his] kidnapping and murder convictions."

[19] Solomon testified: "I would never talk to . . . Marra unless I [was] on tape with him; and I found . . . Marra to tell hundreds of lies about things.

Solomon further testified that Marra had given him only one piece of information regarding the victim's murder, namely, that "Kallman and the [the victim's] daughter . . . Mary Sabol [had broken] into the residence of a Gustave Curcio in Stratford" because "both of them suspected that Mr. Curcio [had] committed the murder; and they broke into that residence to look for a gun that may have been used in the murder."[20] Solomon testified that he had obtained the police report regarding the burglary after he had been informed of the incident, and that he had retained it in the Bridgeport state's attorney's office. With the exception of interviewing Mary Sabol about the burglary, Solomon did not otherwise follow up on the police report. Finally, Solomon testified that the audiotapes of his lengthy interviews with Marra were in the possession of the Bridgeport state's attorney's office.[21]

Against this factual background, we apply the well established legal principles that govern our resolution of the defendant's claims. "We have long recognized the common-law duty of the prosecutor to ensure that all evidence tending to aid in ascertaining the truth be laid before the court, even though such evidence is not consistent with the prosecution's contention that the accused is guilty. . . . Moreover, [t]he state is constitutionally obligated to disclose certain information to a defendant. The principles of due process require the prosecution to disclose exculpatory evidence that is material to a defendant's guilt or punishment. *Brady*

He's admitted to more murders than . . . I can believe possible." Solomon also stated that, on a number of occasions, Marra had confessed to murders and otherwise provided the police with information that either could not be corroborated or conflicted directly with facts already known to the police.

[20] Solomon also testified that Marra never admitted any involvement in the murder of the victim. See footnote 14 of this opinion.

[21] The defendant moved for production of the audiotapes of the police interviews with Marra and the police report concerning the burglary of Curcio's residence.

v. *Maryland*, supra, [373 U.S.] 87." (Citations omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, supra, 225 Conn. 90. In order to prove a violation of the state's obligation to disclose exculpatory evidence under *Brady*, "the defendant bears a 'heavy' burden to establish: '(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material.'" *State* v. *McIntyre*, 242 Conn. 318, 323, 699 A.2d 911 (1997); see also *State* v. *Correa*, 241 Conn. 322, 360–61, 696 A.2d 944 (1997); *State* v. *Esposito*, 235 Conn. 802, 813, 670 A.2d 301 (1996).

"Favorable evidence is that evidence which . . . might have led the jury to entertain a reasonable doubt about [a defendant's] guilt . . . and this doubt must be one that did not otherwise exist." (Citations omitted; internal quotation marks omitted.) *State* v. *Green*, 194 Conn. 258, 265, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *Correa*, supra, 241 Conn. 361; see also *State* v. *Esposito*, supra, 235 Conn. 814–15. Furthermore, "[t]he determination of materiality has been said to be inevitably fact-bound and like other factual issues is committed to the trial court in the first instance." (Internal quotation marks omitted.) *State* v. *Correa*, supra, 361.

A

The defendant first claims that the trial court improperly rejected her claim that she is entitled to a new trial because the state failed to disclose the police report

regarding the burglary of Curcio's home by Kallman and Mary Sabol. We disagree.

In its memorandum of decision on the defendant's motion for a new trial, the trial court properly characterized Kallman's and Mary Sabol's suspicion that Curcio may have killed the victim as nothing more than uncorroborated speculation. At the time of the hearing on her motion for a new trial, the defendant was aware that Kallman and Mary Sabol apparently harbored some suspicion that Curcio, rather than the defendant, had killed the victim. The defendant, however, did not elicit any testimony from Kallman or Mary Sabol regarding the factual basis for their suspicion, nor did the defendant indicate that either Kallman or Mary Sabol was unavailable to testify to explain what information, if any, they had concerning Curcio's role in the killing that had prompted them to burglarize Curcio's home. In such circumstances, it is difficult to see how the information contained in the police report would have been admissible at the defendant's trial, let alone how it would have been of sufficient import to warrant a new trial. Moreover, the trial court also noted that the defendant herself had testified at her trial that she was present when her daughter, Meyer, the state's key witness against the defendant, had killed the victim; see footnote 4 of this opinion; and, therefore, that Kallman's and Mary Sabol's unconfirmed speculation regarding another possible killer could not possibly have been material to the defendant's case.[22] We conclude, there-

---

[22] At trial, the defendant claimed that Meyer had murdered the victim. The defendant testified that she and the victim had been arguing in front of Meyer and that the victim had thrown the defendant to the floor and was kicking her when she heard a loud noise and the victim collapsed. The defendant expressed her opinion that Meyer had shot the victim to prevent him from harming the defendant. Conversely, Meyer testified that the defendant had killed the victim. Physical evidence and testimony by additional witnesses supported the fact that one of the two women did indeed kill the victim. Thus, as the trial court stated in its memorandum of decision, "[q]uite clearly, there were two people present with the deceased at the time of

fore, that the trial court properly rejected the defendant's claim that she is entitled to a new trial on the ground that the state failed to provide her with a copy of the police report regarding the burglary of Curcio's home.[23]

## B

The defendant also maintains that the trial court improperly failed to order a new trial on the ground

[his] murder: the defendant and [Meyer]. The jury believed [Meyer's] testimony that her mother committed the murder; [it] rejected the defendant's testimony that her daughter did it. There is no reasonable doubt that one of the two was the killer."

[23] Although the defendant concedes that the suspicion held by Kallman and Mary Sabol that Curcio might have killed the victim conflicts with the defendant's own trial testimony that Meyer had shot and killed the victim; see footnote 22 of this opinion; the defendant nevertheless maintains that she was entitled to the information contained in the police report regarding the burglary of Curcio's home because that information might have led the defendant to pursue a completely different trial strategy that obviated the need for her testimony. Even if we assume, for the sake of argument, that the defendant's claim regarding a change in trial strategy is sufficiently concrete to implicate the materiality prong of the *Brady* test, we nevertheless would have to reject the defendant's claim because, as we have indicated, a mere uncorroborated suspicion that a third party *might have killed* the victim is simply too speculative to satisfy the materiality requirement.

At oral argument before this court, the defendant also claimed that she might have been able to use the information contained in the police report to impeach the trial testimony of Mary Sabol. "It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused." (Internal quotation marks omitted.) *State* v. *McPhail*, 213 Conn. 161, 167, 567 A.2d 812 (1989); see also *State* v. *Esposito*, supra, 235 Conn. 815–16. We conclude, however, that the defendant has failed to establish that this evidence reasonably could have been used for impeachment purposes. Mary Sabol was called as a witness by the defendant, and her testimony was limited to the substance of a dinner conversation that she had had with the victim shortly before his death, during which the victim had indicated that he was upset with both Meyer and the defendant. Mary Sabol was not a key witness, and her limited testimony was not particularly helpful either to the defendant or to the state. More importantly, her testimony did not touch upon any subject that could have been contradicted by any information contained in the police report of the burglary of the Curcio residence. Accordingly, we reject the defendant's claim that that report could have aided the defendant in her examination of Mary Sabol.

that the audiotapes of the police interviews with Marra constituted exculpatory evidence, and, therefore, that the state's suppression of that evidence violated *Brady*. We are not persuaded.

The trial court, in crediting Solomon's testimony that he did not recall ever accusing Marra of the victim's murder, indicated that "[t]he better view is that [this] accusation was not made." The court also concluded, however, that even if Solomon had accused Marra of the victim's murder, that accusation was not based on any evidence linking Marra to the crime; indeed, Solomon testified without contradiction that he never believed that Marra actually had committed the crime. The court further stated that, assuming, arguendo, that Solomon had, in fact, accused Marra of the victim's murder, he undoubtedly had done so as an investigative technique designed to elicit from a "notorious criminal" whatever information Marra might have had about that and numerous other homicides.[24] Moreover, in reaching its conclusion that, in the circumstances of this case, such an unsubstantiated accusation was neither favorable to the defense nor material to the outcome of the trial, the court noted that the allegedly exculpatory

[24] The trial court stated in relevant part as follows: "[E]ven if the court were to credit Marra's testimony [regarding the accusations], that would not help the defendant. Even taking [Marra's] testimony at face value, there is nothing to indicate that someone other than the defendant committed this crime. The fact that the police might have made accusations does not prove that they had any evidence. [In Marra, t]hey were dealing with a notorious criminal. Every attorney who seriously practiced criminal law knows that police investigators often bluff those they think may have information, in the hope that if they shake the tree hard enough, something may fall out of it. The fact that no warrant was ever served on Marra regarding the [victim's] killing corroborates the view that the police had no such evidence. Moreover, the death penalty, with which Marra claimed Solomon threatened him, was never applicable to [this] case, which . . . Solomon surely knew. The better view is that the accusation was not made. But even if it was, it is of no consequence for the purposes of this case. There is simply no evidence produced by the defense that the police suppressed evidence that someone other than the defendant committed this murder."

evidence conflicted directly with the defendant's own trial testimony that Meyer had killed the victim. We conclude, therefore, that the trial court properly determined that even if Solomon had accused Marra of having committed the murder, the defendant failed to meet her burden of establishing under *Brady* either that any such accusation might have led the jury to entertain a reasonable doubt regarding the defendant's guilt or that the state's failure to disclose the accusation was sufficient to undermine confidence in the jury's verdict.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and PETERS, Js., concurred.

BERDON, J., concurring. I agree with the result reached by the majority and its reasoning. Although the giving of a "Chip Smith" jury instruction has not been challenged by the defendant in this case; see footnote 6 of the majority opinion; I am troubled by the continued use of that powerful instruction, which urges jurors in the minority to listen to those in the majority.

As I stated in my dissent in *State* v. *Beliveau*, 237 Conn. 576, 598 n.1, 678 A.2d 924 (1996): "Jury instructions that encourage jurors to reach a verdict similar to the Chip Smith charge; *State* v. *Smith*, 49 Conn. 376, 386 (1881); like its federal counterpart, the *Allen* charge; *Allen* v. *United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896); have been criticized as inherently coercive in that they are unbalanced in favor of the majority position. *People* v. *Gainer*, 19 Cal. 3d 835, 566 P.2d 997, 139 Cal. Rptr. 861 (1977); *Burnette* v. *State*, 280 Md. 88, 371 A.2d 663 (1977); *Kersey* v. *State*, 525 S.W.2d 139 (Tenn. 1975); 75B Am. Jur. 2d 351, Trial § 1589 (1992). Many courts have abandoned *Allen*-type charges in favor of a standard instruction recommended by the American Bar Association, which provides:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

"It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, for the mere purpose of returning a verdict. 75B Am. Jur. 2d, supra, 352–53." (Internal quotation marks omitted.) In my view, Connecticut trial courts should utilize the instruction recommended by the American Bar Association.