******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# ANTHONY SANTANIELLO, JR. *v.* COMMISSIONER OF CORRECTION
## (AC 46199)

Bright, C. J., and Moll and Flynn, Js.

*Syllabus*

The petitioner, who had been convicted of several crimes, appealed, on the granting of certification, from the habeas court's judgment denying his habeas corpus petition. The petitioner claimed, inter alia, that the habeas court improperly rejected his claim that his prior habeas counsel, B, had rendered ineffective assistance, inter alia, by failing to allege that his criminal trial counsel, R, and his counsel on direct appeal, S, were ineffective in failing to raise a claim that the admission of statements by a jailhouse informant, M, at the petitioner's criminal trial violated the petitioner's sixth amendment right to confrontation under *Crawford* v. *Washington* (541 U.S. 36), which had been decided eleven days before his sentencing.

The habeas court properly concluded that B did not render ineffective assistance by not raising the *Crawford* claim as to R because R did not perform deficiently by failing to move for a new trial in the eleven day period before the petitioner's sentencing, as no court during that time frame had further clarified how *Crawford* applied generally or specifically as to the statements of government informants such as M, and R's failure to advance a novel constitutional argument did not constitute ineffective assistance.

This court concluded that B did not render ineffective assistance by not raising the *Crawford* claim as to S because, although S should have known that she could have raised the unpreserved *Crawford* claim on direct appeal in light of *State* v. *Greene* (274 Conn. 134), which had adjudicated an unpreserved *Crawford* claim several months before S filed her appellate brief, the habeas court properly concluded that any improper admission of M's statements constituted harmless error, as M's statements were unnecessary and cumulative of other independent evidence of the petitioner's guilt, and, because there was not a reasonable likelihood that the *Crawford* claim would have succeeded on appeal, the petitioner was not prejudiced by S's decision to forgo that claim.

B did not render ineffective assistance by failing to claim that R had performed deficiently in making a tactical decision at trial not to assert that the state violated the petitioner's right to counsel under *Massiah* v. *United States* (377 U.S. 201) by using M to elicit incriminating statements about the petitioner, as it was M who had initiated contact with the state, and the

state never asked M to collect information about the petitioner or promised or offered M any benefit for doing so.

Argued September 5, 2024—officially released February 25, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; thereafter, the petition was withdrawn in part; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Desmond M. Ryan*, assistant public defender, for the appellant (petitioner).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, was *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

BRIGHT, C. J. Following the granting of his petition for certification to appeal, the petitioner, Anthony Santaniello, Jr., appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly rejected his claim that his prior habeas counsel performed deficiently by failing to allege that (1) both his trial counsel and appellate counsel provided ineffective assistance in failing to raise the claim that the admission of a jailhouse informant's statements at trial violated his right to confrontation under the United States constitution pursuant to *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and (2) his trial counsel rendered ineffective assistance when he waived the petitioner's claim that the state violated his right to counsel pursuant to *Massiah* v. *United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), by using the same jailhouse informant to elicit incriminating statements from him.

For the reasons that follow, we affirm the judgment of the habeas court.

The following facts underlying the petitioner's criminal conviction, which the jury reasonably could have found on the basis of the evidence admitted at trial, were set forth previously by this court in our decision addressing the petitioner's direct criminal appeal. See *State* v. *Santaniello*, 96 Conn. App. 646, 902 A.2d 1, cert. denied, 280 Conn. 920, 908 A.2d 545 (2006). "The [petitioner] and the victim were acquaintances. The victim lived in a single-family dwelling with her daughter and a female friend, S. On January 12, 2002, the [petitioner] and the victim spent part of the day together, and the victim told the [petitioner] that she planned to go to a local pub in the evening. The victim went to the pub at approximately 9 p.m., where she met several friends including the [petitioner] and S. They remained at the pub until it closed at approximately 2 a.m. Thereafter, the victim returned to her apartment alone, where she left the door unlocked in case S returned later, and she went to bed. She spoke with the [petitioner], via the telephone, during the night.

"Some time thereafter, the [petitioner] appeared in the victim's bedroom. He sat on her bed and proceeded to make advances toward her. The victim repeatedly told the [petitioner] to stop, but he became forceful and overcame the victim, removing her sweatpants, tearing her panties and sexually assaulting her. The victim was left bruised and had a rope like burn on her hip where her panties had been torn from her.

"When S returned home later that afternoon, she knew that something was wrong with the victim. When S questioned the victim, the victim became emotional and 'lost it.' She then told S what had happened. S urged the victim to telephone the police, but the victim did not want to report the incident because she was afraid

of the [petitioner]. S, however, continued to urge the victim to report the incident, and four days later, the victim filed a complaint with the Enfield police. A forensic examination of the victim's panties revealed a stain that contained the [petitioner's] DNA. The [petitioner] was arrested on February 22, 2002. In an amended long form information, the [petitioner] was charged with two counts of sexual assault in the first degree, burglary in the first degree and kidnapping in the first degree (sexual assault case).

"Following the [petitioner's] arrest, he was incarcerated at the Cheshire Correctional [Institution], where he shared a cell with Thomas Marra from May 13 until July 30, 2002. In August, 2002, Marra contacted George Nobile, an inspector with the division of criminal justice, informing Nobile that he had a cell mate who wanted to have a witness killed. Nobile and a supervisor, Gregory Dillon, met with Marra on September 4, 2002, and Marra informed them that the [petitioner] wanted to have the victim killed so that she could not testify against him. Marra provided a letter written by the [petitioner] and explained the code words used in the letter. Subsequently, Marra also provided Nobile and Dillon with further correspondence from and to the [petitioner] concerning the [petitioner's] desire to have the victim killed.

"On October 9, 2002, Marra telephoned the [petitioner] and told him he could put the [petitioner] in contact with an assassin. Nobile then assumed the undercover role of the assassin and contacted the [petitioner] on October 14 and 18, 2002. Nobile set up a meeting with the [petitioner] for the morning of October 21, 2002, but the [petitioner] did not appear for that meeting.

"The [petitioner] was arrested on October 25, 2002, and was held at the Bridgeport Correctional Center,

where he shared a cell with Andre Holeman. The [petitioner] told Holeman that he was facing sexual assault charges and that he had wanted the victim killed so that she could not testify against him. He also told Holeman about Marra and his arranging a meeting with an assassin. He further explained to Holeman that he was supposed to pay the assassin $7500 to kill the victim but that he did not have the funds and, therefore, was considering killing the victim himself. The [petitioner] also asked Holeman to telephone the [petitioner's] attorney to report that the [petitioner] had been set up by Marra. In an amended long form information, the [petitioner] was charged with attempt to commit murder, inciting injury to another person and intimidating a witness (attempted murder case)." (Footnote omitted.) Id., 649–51.

At trial, the petitioner was represented by then Attorney, now Superior Court Judge, Kevin A. Randolph. On January 20, 2004, "[a]fter a consolidated trial, the jury found the [petitioner] guilty of sexual assault in the first degree, kidnapping in the first degree, attempt to commit murder, inciting injury to another person and intimidating a witness." Id., 651. On March 19, 2004, the court, *Lavine, J.*, sentenced the petitioner to a total effective term of forty-two years of incarceration. See id., 648.

The petitioner appealed, claiming that the trial court "improperly (1) abused its discretion in joining and refusing to sever two separate informations, (2) denied the [petitioner's] motion to suppress, (3) failed to conduct an in camera review of documents and (4) refused to consider the [petitioner's] postverdict letter requesting a new trial." Id. Attorney Deborah G. Stevenson, a special public defender, represented the petitioner in his direct appeal. This court affirmed the judgments of conviction, concluding that "(1) there was no substantial injustice in the joinder of the informations in a single

trial, (2) the court properly denied the motion to suppress the [petitioner's] statements because there was adequate evidence from which it could have found that the [petitioner] implicitly waived his right to remain silent, (3) the court was not obligated to review documents and prison records in camera because defense counsel agreed on the record that it was unnecessary and (4) defense counsel unequivocally stated that he was withdrawing his petition for a new trial and would be refiling the petition separately as a civil matter." Id., 648–49. Our Supreme Court subsequently denied the petitioner's petition for certification to appeal. See *State* v. *Santaniello*, 280 Conn. 920, 908 A.2d 545 (2006).

While his direct appeal was pending, the petitioner pursued a petition for a new trial, initially represented by Randolph and then by Attorney William H. Paetzold.[1] At the trial on the petition, the petitioner presented testimony from Felix Cotto, another inmate, as newly discovered evidence supporting a claim that Holeman fabricated his testimony at trial. The court, *Hon. Joseph Q. Koletsky*, judge trial referee, denied the petition, concluding that "[t]here is considerable evidence in the record so that even if the court were to accept Cotto's testimony about [Holeman's] unsworn recantation, there is no indication that the result of the trial would have been different more likely than not."

---

[1] On March 8, 2004, Randolph filed a petition for a new trial in the underlying criminal case on the basis of a letter sent by Marra to Judge Lavine in which Marra stated that he had manipulated and convinced the petitioner to have the victim killed. On March 19, 2004, prior to the sentencing hearing, the court addressed the petition. Randolph argued before the court that the letter constituted newly discovered evidence. Randolph, however, agreed with the court that the petition for a new trial should have been filed instead as a civil action pursuant to Practice Book § 42-55 and General Statutes § 52-270 and, therefore, withdrew the petition. Thereafter, the new petition was filed on May 6, 2004., In his direct appeal, the petitioner claimed that the trial court improperly refused to consider the improperly filed petition for a new trial, and this court concluded that his claim was baseless. See *State* v. *Santaniello*, supra, 96 Conn. App. 672–73.

Following his unsuccessful direct appeal and petition for a new trial, the petitioner commenced his first habeas action, represented by Attorney Walter Bansley IV. In the operative amended petition, the petitioner alleged: (1) his trial counsel (Randolph) performed deficiently by failing (a) to explain the evidence and recommend a plea offer, (b) to explain the right to testify, and (c) to call two witnesses at trial; and (2) his appellate counsel (Stevenson) performed deficiently by failing to claim that there was insufficient evidence for the attempted murder conviction. After a trial on the merits, the first habeas court, *Cobb*, *J.*, denied the petition, concluding that the petitioner had failed to meet his burden of establishing ineffective assistance of counsel for either attorney. The petitioner appealed to this court, challenging the judgment only as to his ineffective assistance of appellate counsel claim. See *Santaniello* v. *Commissioner of Correction*, 152 Conn. App. 583, 584, 99 A.3d 1195, cert. denied, 314 Conn. 937, 102 A.3d 1115 (2014). This court affirmed the first habeas court's judgment; see id.; and our Supreme Court denied the petitioner's petition for certification to appeal. See *Santaniello* v. *Commissioner of Correction*, 314 Conn. 937, 102 A.3d 1115 (2014).

The petitioner then commenced a second habeas action, which underlies the present appeal. In the operative fourth amended petition filed on October 26, 2020, the petitioner alleged, inter alia, that Bansley performed deficiently in the first habeas action by failing to claim that (1) both Randolph and Stevenson provided ineffective assistance of counsel by failing to raise the petitioner's *Crawford* claim, and (2) Randolph provided ineffective assistance of counsel when he waived the petitioner's *Massiah* claim.

The second habeas court, *M. Murphy*, *J.*, conducted a trial over two days, January 25 and April 18, 2022.

During the second habeas trial, the court heard testimony from Randolph, Stevenson, Bansley, Attorney Michael A. Gailor, who was the prosecutor in the original criminal trial, former Inspectors Nobile and Dillon, and three expert witnesses, Attorneys W. Theodore Koch III, Lisa J. Steele, and Vishal K. Garg. The petitioner's arguments at the habeas trial focused on the deficiency of his prior habeas counsel's performance in failing to raise, prove, and argue that (1) pursuant to *Crawford*, the petitioner's right to confrontation was violated when Marra's testimonial statements were presented to the jury despite the fact that Marra was never called as a witness, and (2) the state violated the petitioner's sixth amendment right to counsel when it used Marra to elicit incriminating statements from the petitioner.[2] The court denied the petition, finding that the expert testimony presented by the petitioner was neither helpful nor persuasive, and concluding that the petitioner had failed to show ineffective assistance of counsel by Randolph, Stevenson, or Bansley. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We begin by setting forth guiding principles of law as well as the applicable standard of review for ineffective assistance of counsel claims, which are well settled. "In *Lozada* [v. *Warden*, 223 Conn. 834, 842–43, 613 A.2d 818 (1992)], our Supreme Court established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing what is commonly known as a habeas on a habeas, namely, a second petition for a writ of habeas corpus . . . challenging the performance of counsel in litigating an initial petition for a writ of habeas corpus . . .

---

[2] The petitioner also claimed that his prior habeas counsel was deficient in failing to claim that the petitioner's sexual assault and attempted murder cases should not have been joined for trial. The habeas court rejected this claim, and the petitioner does not challenge that conclusion in the present appeal.

[that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . Nevertheless, the court in *Lozada* also emphasized that a petitioner asserting a habeas on a habeas faces the herculean task . . . of proving in accordance with *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . . Any new habeas trial would go to the heart of the underlying conviction to no lesser extent than if it were a challenge predicated on ineffective assistance of trial or appellate counsel. The second habeas petition is inextricably interwoven with the merits of the original judgment by challenging the very fabric of the conviction that led to the confinement." (Internal quotation marks omitted.) *Lebron* v. *Commission of Correction*, 204 Conn. App. 44, 50, 250 A.3d 44, cert. denied, 336 Conn. 948, 250 A.3d 695 (2021).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [supra, 466 U.S. 687]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may [deny] a petitioner's claim if he fails to meet either prong." (Internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 220 Conn. App.

567, 583, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023).

"The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . [T]his court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Lebron* v. *Commissioner of Correction*, supra, 204 Conn. App. 51. With these principles in mind, we address each of the petitioner's claims in turn.

I

The petitioner first claims that Bansley provided ineffective assistance of counsel by failing to raise a claim regarding both Randolph's and Stevenson's failure to pursue a claim, either at his criminal trial or in his direct appeal, that the admission of Marra's statements through other witnesses violated his right to confrontation under the United States constitution pursuant to *Crawford* v. *Washington*, supra, 541 U.S. 36. Specifically, the petitioner claims that Randolph was ineffective in failing to seek a new trial on the basis of *Crawford*, that Stevenson was ineffective in failing to raise a *Crawford* claim in his direct appeal, and that the petitioner was prejudiced by these deficiencies.[3] We are not persuaded.

---

[3] On appeal, the petitioner also claims that the habeas court erred by applying an incorrect legal standard when evaluating the prejudice prong of the petitioner's ineffective assistance claims relating to the *Crawford* claim. When discussing Randolph's performance, the court concluded that "[the petitioner] has failed to establish that he was prejudiced thereby because he has not demonstrated that the trial court *would* have granted a new trial on this basis." (Emphasis added.) Similarly, the court also concluded that "[the petitioner] has failed to demonstrate that he *would* have prevailed on appeal had Stevenson raised a *Crawford* claim . . . ." (Emphasis added.) The petitioner asserts that, by assessing whether the petitioner

The following additional facts are relevant to our analysis. The sexual assault case and the attempted murder case were consolidated for trial. At trial, the victim testified about the events that occurred the night she was assaulted by the petitioner. To corroborate the victim's testimony that the petitioner had sexually assaulted her, the state introduced exhibit 3, a photo of the injury she sustained during the assault; exhibit 8, the shirt she was wearing; exhibit 6, her sweatpants with a broken drawstring, which the victim explained broke during the assault; and exhibit 7, her underwear. The state also presented the testimony of the victim's roommate, who testified about the victim's recounting of the assault to her, her observations of both the injuries on the victim's body and the victim's emotional state, and her assistance in reporting the crime by calling a crisis hotline to obtain advice for the victim. The victim's testimony also was corroborated by her room-

would have succeeded as opposed to whether there was a reasonable probability that the petitioner would have succeeded, the habeas court improperly increased the burden of proof borne by the petitioner. See *Delgado* v. *Commissioner of Correction*, 224 Conn. App. 283, 291, 311 A.3d 740 ("[t]o satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (internal quotation marks omitted)), cert. denied, 349 Conn. 902, 312 A.3d 585 (2024). This claim warrants little discussion.

The habeas court set forth the correct legal standard for the prejudice prong in its memorandum of decision when discussing the petitioner's claim as to Stevenson: "[W]hen a petitioner is claiming ineffective assistance of appellate counsel, he must establish that there is a reasonable probability that, but for appellate counsel's error, [he] would have prevailed in his direct appeal." (Internal quotation marks omitted.) We do not read the court's omission of the phrase "reasonable probability" in stating its conclusions regarding Randolph as demonstrating that the court applied an incorrect legal standard. In any event, because we hold that the court properly concluded that the petitioner failed to prove that Randolph performed deficiently as to the *Crawford* claim, any misstatement by the court as to the prejudice prong of *Strickland* was harmless. See *Crocker* v. *Commissioner of Correction*, supra, 220 Conn. App. 583 ("[b]ecause both prongs . . . must be established for a habeas petitioner to prevail, a court may [deny] a petitioner's claim if he fails to meet either prong" (internal quotation marks omitted)).

mate's spouse, who testified about his observations of the victim's emotional state, the conversation between the victim and her roommate, in which the victim indicated that she had been assaulted, and the roommate's call to the crisis hotline. The state also offered expert testimony describing the forensic examination of the victim's underwear, which contained the petitioner's DNA.

Major Jonathan Hall, an employee at Cheshire Correctional Institution, testified that, on February 27, 2002, the petitioner had been transferred there and that the petitioner and Marra shared a prison cell from May 13 to July 30, 2002, on which date the petitioner was released on bond.

Dillon, an inspector with the Office of the Chief State's Attorney, testified about his participation in the arrest of the petitioner on October 25, 2002, for the attempted murder charge and the statements the petitioner voluntarily made to law enforcement at that time. Dillon testified that the petitioner had told Dillon that he was not familiar with the victim's address as of October, 2002, nor the type of car she operated at that time. Holeman, who briefly shared a prison cell with the petitioner at Bridgeport Correctional Center, testified that the petitioner described the sexual assault charge as a date that went too far. Holeman testified that the petitioner told him that "Marra was going to handle some things for him," that "Marra was going to kill the person, put the person in the junkyard in a car and get rid of the body," and that the petitioner wanted the victim killed so she could not testify against him. On cross-examination, Holeman testified that he saw a television news report on October 25, 2002, about the petitioner's case. Both Randolph and the state attempted to distinguish between information Holeman learned

through the news report and from the petitioner. Holeman testified that the news program gave only the petitioner's name and showed his face, and that the details shared by the petitioner about which Holeman testified were not included in the program.

The most relevant witness to the petitioner's claims in the present case, called by the state at trial, was Nobile. He testified that he had received a letter from Marra in August, 2002, in which Marra wrote that he had a cellmate who wanted to have a witness killed. A copy of that letter was admitted into evidence at trial as exhibit 14. Exhibit 14 is addressed to Nobile and signed by Marra. In the letter, Marra states, "I've been trying to get in touch with you to see if you might be interested in the following information. I'm in contact with this person in the Hartford/Tolland area that wants to have a witness in a major criminal case disappear/murder[ed] as soon as possible." Marra further claimed that he had the witness' identifying information and could put Nobile into direct contact with the petitioner. He made clear, however, that he was "looking for something in return for this." Nobile testified that, after receiving the letter, he and Dillon met with Marra on September 4, 2002. At that meeting, Marra gave them the petitioner's name and an additional correspondence he had with the petitioner, which was admitted into evidence as exhibit 12. Exhibit 12, a letter dated May 8, 2002, and postmarked August 8, 2002, is addressed to "Tommy" and signed, "Joe." At the petitioner's criminal trial, the state did not rely on the body of the letter, which primarily updated Marra on the petitioner's life since he "came home." Nobile testified that he found two things about the letter significant. At the bottom of exhibit 12 is a reference to "Donna's #" opposite the signature, "Joe." Nobile testified that Marra had told him that Donna referred to the victim, and that "Joe" was short for Joe Black and referred to the petitioner.

Nobile further testified that the letter's envelope was significant because the return address, under the name "J. Black," matched the victim's address. Nobile testified that he did not take the information provided by Marra at face value; both Nobile and Dillon conducted further investigation and confirmed the name of the victim and her address.[4] Nobile testified that Dillon had independently researched the significance of the alias, Joe Black, and concluded that it was a reference to a 2001 movie called "Meet Joe Black," in which the character Joe Black represented death.

Nobile testified that he had another meeting with Marra on October 8, 2002. At this meeting, Marra gave him another letter he had received from the petitioner, which was admitted into evidence as exhibit 13. Exhibit 13 is a letter dated September 9, 2002, written to "Boss-man" and signed, "J. Black." The letter contains the phrase, "[o]ne ninety Rose Soap Dish is with Donna like also white four-door Blazer." Nobile testified that "190RSD" is the license plate number of the victim's vehicle and that the description, "white four-door Blazer" matched the victim's vehicle. Nobile testified that, at the October 8, 2002 meeting, he and Dillon had asked Marra to make a phone call to the petitioner. The call eventually was arranged for October 9, 2002, and the recording was offered into evidence at trial, with copies of the transcript of the recording given to the jury. During the call, Marra mentioned "our girlfriend" and referred to the letters he and the petitioner had exchanged, to which the petitioner responded affirmatively. During the conversation, Marra and the petitioner discussed the code used in the letters as follows:

[4] Dillon similarly testified that, through his own investigation, he had the opportunity to determine the victim's address, car type, and license plate number, and that the address on the envelope of the letter matched the victim's address.

"[Marra]: Uhhh, now listen, let me ask you one other question, right.

"[The Petitioner]: Yep.

"[Marra]: The, the letter you sent me about the white truck, I'm not the brightest guy in the world . . . .

"[The Petitioner]: Yup.

"[Marra]: You, you put soap slash. Is that what I think it is?

"[The Petitioner]: What'd you . . . .

"[Marra]: You, you put soap slash, you put rose soap, and with the s you put a slash. You put dish you put a slash.

"[The Petitioner]: Yeah first letters of every, first letters of the uhh, of the thing, the . . . tag. Ya know what I mean?

"[Marra]: The . . .

"[The Petitioner]: It's like when it's S or [whatever] it is, where all of those slashes are.

"[Marra]: Right.

"[The Petitioner]: Those are the, those are the letters.

"Marra: The . . . . Oh, oh, oh yeah. [They are] the first letters of our our deal. [Okay]. I forgot. . . .

"[The Petitioner]: Yeah."

Nobile testified that, in his role as the undercover assassin, he had called the petitioner on October 14, 2002, and left him a voice message. In the voicemail, Nobile referred to himself as "Tommy's friend." When

the petitioner returned Nobile's call later that day, Nobile and the petitioner engaged in the following conversation,[5] establishing a time frame, the price for having the victim killed, which Marra previously had told the petitioner, and when to next talk on the phone:

"[Nobile]: What's, uhhh, what's her name 'Donna'?

"[The Petitioner]: Yup.

"[Nobile]: Uhh, wh-what's the time frame on this? Wh-wh-when are things gonna start?

"[The Petitioner]: Uhh, when, whenever really. Umm, it, it doesn't really matter.

"[Nobile]: Yeah, because . . . he made it kinda sound like it was a rush.

"[The Petitioner]: Well, like within a month or so. Ya know, I don't, I mean I don't know what your time frame is, ya know? . . .

"[Nobile]: What'd he tell ya.

"[The Petitioner]: Uhhh, like 75.

"[Nobile]: Yeah, cause he, he kinda low balls it. But that's all right. I mean he, he says that you, you know her pretty well.

"[The Petitioner]: Yep.

\* \* \*

"[Nobile]: Now he also said too, [something] about a different car or somethin[g]. Then he started tellin[g] me somethin[g] about . . . .

"[The Petitioner]: Uhh, yeah, there's, there's still the same things there from before in the letter I wrote him, just them two.

---

[5] Nobile recorded both the voicemail and the phone conversation from October 14, 2002, a transcript of which was admitted into evidence at trial as exhibit 17.

"[Nobile]: . . . Some numbers and some letters or somethin[g] like that. Right?

"[The Petitioner]: Yuhh, yeah.

"[Nobile]: Alright, uhh . . . what I'll do is I'll give you uhh, I'll give you a call tomorrow about this time.

"[The Petitioner]: OK."

Nobile and the petitioner spoke once more on October 18, 2002. A transcript of that conversation was admitted into evidence as exhibit 18. During the October 18, 2002 conversation, Nobile and the petitioner agreed to meet in the Enfield area. The following exchange occurred between Nobile and the petitioner:

"[Nobile]: Alright I'll give you a call when I get up there.

"[The Petitioner]: OK.

"[Nobile]: And then we can meet from there. Now the only thing is, uhhh, our friend, our friend told ya that there's a, uhhh, a little thing up front for good faith, right?

"[The Petitioner]: Uhhh, I guess we'd, I'd have to talk to more, more or less by Monday, ya know, from what me and [Marra] talked about.

"[Nobile]: OK. Yeah [because] like.

"[The Petitioner]: [You] know, so I'll, I mean, I guess I could talk to you, I should let you know what this all means.

"[Nobile]: OK. Alright, we'll do that, but then figure what I'll do is, uhh, Monday, uhhh, between 10:30 and 11 I'll get up there and I'll give you a call.

"[The Petitioner]: OK."

Nobile testified at trial that the petitioner did not appear at the agreed upon time. Nobile further testified that, sometime thereafter, he and Dillon participated in the execution of a search warrant at the petitioner's house where they located additional letters from Marra to the petitioner in the petitioner's bedroom, including a letter dated August 13, 2002, which was admitted into evidence as exhibit 19, addressed to "Anthony" and signed, "Tom Marra." Part of the August 13 letter reads: "That address is Donna, so I'll start to check it out it would be a big help if you had Donna plate number, then we can get all the information Donna needs for parts." Nobile testified that they also seized an address book from the petitioner's bedroom, which was admitted into evidence as exhibit 20 and contained Marra's inmate number and a phone number at which someone connected with Marra could be reached; a scrap of paper, which was admitted into evidence as exhibit 21 and described by Nobile in his testimony as follows: "It's Tom Marra, the number after it is 73281, and there is a telephone number and a name that is circled. It's 203-372-8993, the name is Connie. Directly below that is the name Joseph Black, name, address, [date of birth], and it also says DOL, meaning driver's license number"; a book that referenced the victim's phone number; and a photo of the victim.

After the conclusion of the state's case, the defense elected not to call any witnesses and moved for a judgment of acquittal, which the court denied on January 12, 2004. Neither the state nor the defense called Marra as a witness.

At the close of trial, the court gave the jury limiting instructions as to what evidence could be considered for what purpose in each case. Specifically, the court instructed the jury that the following evidence, which had been admitted as exhibits 15 through 18, was admissible for all purposes in the attempted murder case: (1)

the telephone conversations between Nobile and the petitioner, as well as those between Marra and the petitioner, in both transcript and recorded form; (2) a notice of rights form, which had been given to the petitioner and admitted into evidence as exhibit 11; and testimony by Dillon as to the petitioner's statements to law enforcement following his arrest on October 25, 2002; (3) the letters between Marra and the petitioner, exhibits 12, 13, 14, 19 and 22; and (4) statements the petitioner made to Marra or Nobile after September 4, 2002, the date when Marra became an agent for the state. With respect to the sexual assault case, the court instructed the jury that exhibit 14 was admitted for all purposes, and that exhibits 12 and 13 were admitted solely as consciousness of guilt evidence.

On January 20, 2004, the jury returned its verdicts, finding the petitioner guilty of all charges. On March 8, 2004, the United States Supreme Court issued its decision in *Crawford* v. *Washington*, supra, 541 U.S. 36, in which the court held that out-of-court statements that are testimonial in nature are barred under the confrontation clause unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. See id., 68. Randolph did not file a motion for a new trial based on *Crawford* prior to the petitioner's March 19, 2004 sentencing and did not raise *Crawford* in the petition for a new trial that he filed on May 6, 2004.

It was unclear whether Randolph was aware of *Crawford* while he represented the petitioner. At the second habeas trial, he testified that, "[t]ypically, I would not be reading federal case law at that time during the course of the trial." Further, Randolph testified that, even if it were assumed that he had been aware of *Crawford* and that the new rule it established applied to the petitioner's case, a change in the law provided no basis for a new trial because it was not newly discovered

evidence; rather, he maintained, it was an issue more appropriate for appellate counsel to raise on appeal.

Stevenson filed the petitioner's appellate brief with this court on October 5, 2005. As previously noted in this opinion, Stevenson raised several claims in the petitioner's direct appeal, although she did not raise a *Crawford* claim.

At the underlying habeas trial, Stevenson testified as to her recollection of her handling of the petitioner's appeal during the following exchange with the petitioner's counsel:

"[The Petitioner's Counsel]: Okay. Do you think that the record would have been sufficient for [the Appellate Court to review] a *Crawford* claim pursuant to [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)]?

"[Stevenson]: . . . I think so, yes. I always try to raise *Golding*, you know, to protect the client's right in case the trial counsel does not raise it . . . .

"[The Petitioner's Counsel]: Okay. And, and under your understanding of the, the *Golding* prongs, none of them wouldn't, would not have been met by the *Crawford* claim here. Is that right?

"[Stevenson]: I'm not sure I understand the question.

"[The Petitioner's Counsel]: You, do you know—do you recall what the prongs are for *Golding*?

"[Stevenson]: Again, my memory fails me, but, but there are four of them. . . . [Y]ou have to have the facts, et cetera—the first two are a little fuzzy, but definitely the third is, is the obstacle. For me, most of the time it's, it has to raise a constitutional issue, but I'm fuzzy on the other three. I apologize.

"[The Petitioner's Counsel]: That's okay. Just to the extent that you recall it not meeting *Golding* wasn't a reason you rejected it. Would that be fair to say?

"[Stevenson]: No. I don't believe so, no. . . .

"[The Petitioner's Counsel]: Given the constraints that were placed on you with respect to the motion to review the materials in camera, why wouldn't you consider raising the *Crawford* claim in lieu of that one?

"[Stevenson]: To be honest, I do not know. Okay? It—if I didn't, it—was it error on my part? It may have been. I, I don't honestly recall expressly ruling it in or out. I think I was just more focused on the other issues that, that were really troublesome.

"[The Petitioner's Counsel]: Okay. So, it wasn't necessarily a conclusion that *Crawford* was a weaker claim than the others that you decided to brief?

"[Stevenson]: I don't think I put it that way in my mind as I was writing it. Again, I was more focused on the other issues then."

The habeas court found that neither Randolph nor Stevenson had performed deficiently by failing to raise a *Crawford* claim. As to Randolph's performance, the habeas court found "that it would be unreasonable to conclude that . . . Randolph rendered deficient performance by not seeking a new trial in the eleven day window between the release of *Crawford* and [the petitioner's] sentencing." The court noted that when *Crawford* was decided, it was unknown whether the new rule applied retrospectively or prospectively. Regarding Stevenson, the habeas court found that "Stevenson's review of the record led her to conclude that a *Crawford* claim was not properly preserved for appeal. . . . It was reasonable under the circumstances of this case for Stevenson to not seek *Golding* review of a *Crawford* claim," given that, in 2022, "[t]he question of whether

and to what extent unpreserved claims alleging violations of *Crawford* v. *Washington*, [supra, 541 U.S. 36], are subject to *Golding* review [was] currently pending before [our Supreme Court]. See *State* v. *Robles*, Docket No. SC 20452 (argued October 18, 2022)." (Citations omitted; footnote omitted; internal quotation marks omitted.) The habeas court further concluded that, "even if [it] were to assume that the first three *Golding* prongs have been satisfied, [the petitioner's] inability to cross-examine Marra was harmless error. [The petitioner] *himself*, not Marra, provided the critical facts needed to convict him in the attempted murder case through his correspondence to Marra and his phone conversation with Nobile. Therefore, [the petitioner] has failed to demonstrate that he would have prevailed on appeal had Stevenson raised a *Crawford* claim pursuant to *Golding* . . . ." (Emphasis in original.)

A

We first address the petitioner's claim with respect to Randolph. The petitioner claims that the habeas court's reasoning as to Randolph's failure to raise a *Crawford* claim "ignores that (1) the [United States] Supreme Court's then existing retroactivity rules made *Crawford* applicable to the petitioner's case, and (2) . . . Randolph testified that (a) he did not believe he would have been aware of a [United States] Supreme Court decision shortly after it was published, (b) he did not believe it was his job to litigate the *Crawford* issue after it arose for the petitioner, and (c) he did not believe he had any basis to file a motion for new trial because . . . *Crawford* . . . did not constitute new evidence." (Footnote omitted.) The petitioner contends that a reasonably competent attorney would have moved for a new trial pursuant to Practice Book § 42-53 on the ground that the admission of Marra's statements through Nobile violated the petitioner's right to confrontation as set

forth in *Crawford*. We conclude that the petitioner has failed to establish that Randolph performed deficiently.

To provide the proper context for the petitioner's claim, we start with a brief review of *Crawford*. Prior to *Crawford*, the United States Supreme Court had not distinguished between testimonial and nontestimonial statements for purposes of determining when the admission of hearsay statements of unavailable witnesses in criminal cases violated the confrontation clause of the sixth amendment. See *Crawford* v. *Washington*, supra, 541 U.S. 71–72 (Rehnquist, C. J., concurring in the judgment). Rather, under the previous test set in forth *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), all such statements were admissible if they had "adequate indicia of reliability . . . [which] can be inferred . . . where the evidence falls within a firmly rooted hearsay exception . . . [or pursuant to] a showing of particularized guarantees of trustworthiness." (Internal quotation marks omitted.) Id., 66. The court in *Crawford* described this test as "unpredictable" because "[w]hether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them. . . . [T]he unpardonable vice of the *Roberts* test, however, is . . . its demonstrated capacity to admit core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude." (Citations omitted.) *Crawford* v. *Washington*, supra, 63. To satisfy the constitutional demand of confrontation prescribed by the sixth amendment, the court reformulated the test to distinguish between testimonial and nontestimonial statements, holding that testimonial evidence is not admissible under the sixth amendment, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. See id., 68. In the present

matter, the petitioner argues that the standard adopted in *Crawford* "created a new basis to exclude evidence that might otherwise be admissible pursuant to the rules of evidence. At a new trial . . . [Marra] would have been 'unavailable' for purposes of cross-examination, and the *Crawford* rule would have excluded all his testimonial statements." (Citation omitted.)

Notably, in *Crawford*, the court declined "to spell out a comprehensive definition of 'testimonial' "; *Crawford* v. *Washington*, supra, 541 U.S. 68; however, the court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . Various formulations of this core class of testimonial statements exist: [1] ex parte in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . Regardless of the precise articulation, some statements qualify under any definition . . . . Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. . . .

"In sum, even if the [s]ixth [a]mendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." (Citations omitted; internal quotation marks omitted.) Id., 51–53. The court acknowledged the dissent's criticism that its "refusal

to articulate a comprehensive definition in [*Crawford* would] cause interim uncertainty"; id., 68 n.10; but it reasoned that such a result "can hardly be any worse than the status quo. . . . The difference is that the [prior] test is *inherently*, and therefore *permanently*, unpredictable." (Citation omitted; emphasis in original.) Id.

The petitioner specifically contends that Randolph should have moved for a new trial pursuant to Practice Book § 42-53 and argued that Marra's out-of-court statements should not have been admitted under *Crawford*.[6] Even if the trial court had permitted such a motion weeks after the verdicts were returned,[7] a motion for a new trial must be filed with the trial court before sentencing. See *State* v. *Ramos*, 306 Conn. 125, 134, 49 A.3d 197 (2012) (under common law, trial court's jurisdiction over criminal case terminates once defendant begins serving sentence). Consequently, in order to raise a *Crawford* claim regarding Marra's statements, Randolph would have had to move for a new trial in the eleven days between the release of *Crawford* and the petitioner's sentencing. In this eleven day period, no court had further addressed or clarified the dividing line between testimonial and nontestimonial statements. Nevertheless, the petitioner asserts that "a reasonably competent attorney in . . . Randolph's shoes

---

[6] Practice Book § 42-53 provides in relevant part: "(a) Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the errors, the judicial authority shall grant the motion:

"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or

"(2) For any other error which the defendant can establish was materially injurious to him or her . . . ."

[7] Practice Book § 42-54 provides: "Unless otherwise permitted by the judicial authority in the interests of justice, a motion for a new trial shall be made within five days after a verdict or finding of guilty or within any further time the judicial authority allows during the five-day period."

would have argued that, under *Crawford*, Marra's testimonial statements should have been excluded and feel confident in having a strong argument given the postverdict developments in this case." We are not persuaded.

The petitioner's argument assumes that the application of *Crawford* to statements such as those made by Marra to Nobile was immediately clear. Such was not the case. In fact, our Supreme Court did not address the application of *Crawford* to statements made by an informant until four years later in *State* v. *Smith*, 289 Conn. 598, 622–27, 960 A.2d 993 (2008). Notably, by the time our Supreme Court decided *Smith*, the United States Supreme Court had further elaborated on the third category of testimonial statements in *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), and created a " 'primary purpose' " test to distinguish between nontestimonial and testimonial statements made to law enforcement. *State* v. *Smith*, supra, 623. Even then, our Supreme Court made clear that not all statements made by an informant are testimonial. See id., 625.

In *Smith*, a jailhouse informant had approached federal authorities offering incriminating statements made by the coconspirator about the defendant and subsequently agreed to wear a recording device and elicit further incriminating statements from the coconspirator. Id., 615. At the defendant's trial for, inter alia, murder and conspiracy to commit murder, the trial court admitted into evidence a recorded conversation between the informant and the coconspirator, and the jury found the defendant guilty on all of the charges. Id., 601–602. In his direct appeal to our Supreme Court, the defendant claimed that the informant's portion of the conversation should have been excluded as testimonial statements pursuant to *Crawford*. Id., 613–14. The defendant sought review of his unpreserved *Crawford* claim pursuant to *State* v. *Golding*, supra, 213 Conn.

239–40. Although our Supreme Court ultimately concluded that the defendant could not prevail on the merits of his *Crawford* claim because any error by the trial court was harmless, the court assessed the testimonial nature of the informant's statements and concluded that some were testimonial and violated the defendant's right to confrontation. See id., 628–29.

At the outset of its analysis, the court in *Smith* observed that the defendant's claim involved an issue of first impression in Connecticut and noted that, "although the consensus among the federal and state courts that have considered this question is that an informant's portion of a recorded conversation with a defendant made in the course of an investigation is not testimonial in nature, the deciding factor in their determination is the purpose for which the statements are introduced. . . . When an informant's statements were used only to provide context for the incriminating statements of the other party, these federal and state jurisdictions have concluded that the informant's statements were neither hearsay nor considered testimonial statements for the purposes of the confrontation clause." (Citations omitted; internal quotation marks omitted.) Id., 624–25.

Our Supreme Court agreed with the "contextual approach" employed by those federal and state jurisdictions "to the extent that an informant's statements will be deemed nonhearsay and nontestimonial when the statements merely place the conversation in context and serve no substantive purpose." Id., 625–26. Applying this approach, the court in *Smith* concluded that some of the informant's statements were testimonial and others merely provided context for the coconspirator's statements. See id., 626–28. Nevertheless, the court concluded that the defendant's claim failed under *Golding*'s fourth prong because the improper admission of those statements constituted harmless error. See id., 628–30.

On the basis of the court's analysis in *Smith*, it is unclear whether all of Marra's statements would be considered testimonial even today. Certainly, not all of Marra's statements fall squarely and undoubtedly within any of the three core categories of testimonial statements expressly recognized in *Crawford*, nor were they all used for hearsay purposes as observed in *Smith*. Given the recognized lack of clarity in how *Crawford* applied generally, and specifically as to the statements of government informants, a posttrial claim by Randolph, made within days of when *Crawford* was issued, would have tread new ground in an area in which the United States Supreme Court itself had just rewritten the law. As our Supreme Court noted shortly after *Crawford* was decided, "[t]he express distinction drawn by the United States Supreme Court in *Crawford* between testimonial and nontestimonial hearsay statements, for purposes of the confrontation clause, is a novel one." *State* v. *Rivera*, 268 Conn. 351, 364 n.13, 844 A.2d 191 (2004).

In essence, "the petitioner takes issue with his counsel's failure to assert a novel theory that [had] neither been presented to, nor accepted by, the courts of this state. As our Supreme Court has held, counsel's failure to advance novel legal theories or arguments does not constitute ineffective performance. . . . To conclude that counsel is obligated to recognize and to preserve previously undecided constitutional claims, the viability of which is purely speculative, would be to require criminal defense lawyers to possess a measure of clairvoyance that the sixth amendment surely does not demand. . . . Thus, the failure of counsel to pursue a novel constitutional argument does not constitute ineffective assistance." (Citations omitted; internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 198 Conn. App. 345, 358, 233 A.3d 1106, cert. denied, 335 Conn. 948, 238 A.3d 18 (2020). "Counsel

. . . performs effectively when he elects to maneuver within the existing law, declining to present untested . . . legal theories." (Internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 462, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006).

Accordingly, we agree with the habeas court's conclusion that Randolph did not render deficient performance in failing to raise a claim pursuant to *Crawford* shortly after that decision was issued.[8] See id., 461 ("while the failure to advance an established legal theory may result in ineffective assistance of counsel under *Strickland*, the failure to advance a novel theory never will" (internal quotation marks omitted)). Consequently, the petitioner's claim that Bansley rendered ineffective assistance of counsel by not raising the *Crawford* claim as to Randolph necessarily fails.

B

We next address the petitioner's claim that Stevenson provided ineffective assistance of counsel by failing to raise a *Crawford* claim on direct appeal. More specifically, the petitioner claims that the habeas court improperly concluded that Stevenson made a reasonable decision not to pursue this claim on appeal given the open question of whether review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, applied to a *Crawford* claim and that the petitioner failed to demonstrate a reasonable probability of success on appeal, as the

---

[8] Because we conclude that Randolph did not perform deficiently by failing to raise a *Crawford* claim, we need not address the prejudice prong under *Strickland*. See *Williams* v. *Commissioner of Correction*, 223 Conn. App. 745, 753, 310 A.3d 381 ("[i]t is well settled that courts may decide against a petitioner on either prong [of the test articulated in *Strickland* v. *Washington*, supra, 466 U.S. 687, and *Hill* v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)], whichever is easier" (internal quotation marks omitted)), cert. denied, 349 Conn. 901, 312 A.3d 586 (2024).

admission of Marra's statements would have consti-tuted harmless error. We disagree with the petitioner.

The following legal principles inform our analysis of the petitioner's claim. "Under the performance prong [of *Strickland*], [a] court must indulge a strong pre-sumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . . [Although] an appellate advocate must provide effective assistance, [she] is not under an obligation to raise every conceivable issue. A brief that raises every color-able issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . [I]f the issues not raised by his appel-late counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since *the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation.*" (Emphasis in original; internal quota-tion marks omitted.) *Cator* v. *Commissioner of Correc-tion*, 181 Conn. App. 167, 176, 185 A.3d 601, cert. denied, 329 Conn. 902, 184 A.3d 1214 (2018).

In the present case, the petitioner did not preserve a challenge to the admission of Marra's statements at trial, presumably because *Crawford* had yet to be decided. Accordingly, to determine whether Stevenson rendered deficient performance in the petitioner's direct appeal by failing to raise an unpreserved *Craw-ford* claim pursuant to *Golding*, we must consider whether that unpreserved claim would have survived *Golding* review.

The second habeas court concluded that it "was rea-sonable under the circumstances of this case for Steven-son to not seek *Golding* review of a *Crawford* claim, a type of review still not approved by the Supreme Court." In reaching that conclusion, the court failed to recognize that, in *State* v. *Greene*, 274 Conn. 134, 167,

874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006), which was decided months before Stevenson filed her appellate brief in the petitioner's direct appeal, our Supreme Court had reviewed a defendant's unpreserved *Crawford* claim pursuant to *Golding*. In *Greene*, the defendant claimed that the admission of hearsay statements made by unavailable victims violated his right to confrontation under the sixth amendment to the United States constitution. Id., 165. Like the procedural history in the present appeal, the underlying criminal trial in *Greene* concluded before the release of *Crawford*. On appeal, the defendant in *Greene* conceded that his sixth amendment claim was not preserved at trial but asserted that his unpreserved claim nevertheless was reviewable pursuant to *Golding*. Id., 142. Our Supreme Court agreed that his unpreserved claim was reviewable under *Golding*'s first two prongs, as the record was adequate for review and the claim was of constitutional magnitude. See id., 167. Ultimately, however, the court rejected the defendant's claim on the merits under *Golding*'s third prong, concluding that no constitutional violation existed because the challenged statements were not testimonial in nature. See id., 171–72. In light of *Greene*, we disagree with the habeas court's reasoning as to the supposedly "open question" regarding *Golding* review of unpreserved *Crawford* claims. Instead, we conclude that Stevenson should have known that she could raise an unpreserved *Crawford* claim pursuant to *Golding*.

The respondent, the Commissioner of Correction, also argues that it would have been reasonable for Stevenson to conclude that Randolph had waived the *Crawford* claim by failing to object to the introduction of Marra's statements through Nobile. We disagree. "[W]hen the law governing a defendant's constitutional claim has changed after the defendant's trial, counsel acting under binding precedent in effect at the time of

the trial cannot make a knowing and intelligent waiver of rights affected by the later decision changing the law." *State* v. *Johnson*, 345 Conn. 174, 188–89, 283 A.3d 477 (2022).[9] Further, although the respondent is correct that *Johnson* had not been decided at the time of the petitioner's criminal trial, it would have been reasonable for Stevenson to have relied on *State* v. *Greene*, supra, 274 Conn. 134, in which trial counsel similarly did not object to the challenged testimony prior to the existence of a colorable claim under the confrontation clause. Consequently, we address whether there was a reasonable likelihood that the petitioner's unpreserved *Crawford* claim would have been successful on direct appeal to determine whether Stevenson performed deficiently in not raising such a claim and whether the petitioner was prejudiced by her failure to do so.

Our analysis is guided by well established principles. "[The *Golding* doctrine] permits a [petitioner] to prevail

---

[9] Both the habeas court and the respondent rely on footnote 8 in *State* v. *Johnson*, supra, 345 Conn. 174, in positing that the question of whether *Golding* applied to a *Crawford* claim was still uncertain. Id., 185 n.8 ("The question of whether and to what extent unpreserved claims alleging violations of *Crawford* . . . are subject to *Golding* review is currently pending before this court. See *State* v. *Robles*, Docket No. SC 20452 (argued October 18, 2022)." (Internal quotation marks omitted.)). Further, the respondent asserts that "[t]he [court in] *Robles* . . . thereafter determined that it did not need to address the issue because, even if *Golding* applied, the state had proven that any *Crawford* violation was harmless. . . . Thus, the issue remains undecided." (Citation omitted.) We disagree with the respondent's reading of *Johnson* and *Robles*. Although the footnote in *Johnson*; see *State* v. *Johnson*, supra, 185 n.8; does indicate that the then pending appeal in *Robles* would address the application of *Golding* to unpreserved *Crawford* claims, the specific issue in *Robles* was whether the defendant had waived his *Crawford* claim by failing to raise it at trial. See *State* v. *Robles*, 348 Conn. 1, 8, 301 A.3d 498 (2023). As we conclude in the present case, consistent with our Supreme Court's conclusion in *Johnson* and *Greene*, the petitioner could not have waived his claim, given the unique circumstances in which the governing law changed after the case was tried, which was not the case in *Robles*. Moreover, as we stated previously, *Greene* dispels any uncertainty of whether *Golding* review applies to *Crawford* claims such as the petitioner's.

on [an unpreserved] claim of constitutional error . . . only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [petitioner] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the [petitioner] may prevail." (Internal quotation marks omitted.) *Cator* v. *Commissioner of Correction*, supra, 181 Conn. App. 177–78. "We are free to respond to the [petitioner's] claim by focusing on whichever *Golding* prong is most relevant, as the inability to meet any one prong requires a determination that the [petitioner's] claim must fail." (Internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, 226 Conn. App. 617, 634, 319 A.3d 242, cert. denied, 350 Conn. 912, 324 A.3d 143 (2024).

In the present case, the reviewability prongs are satisfied because the record is adequate for review and the petitioner's *Crawford* claim is of constitutional magnitude and alleges the violation of a fundamental right. As to the merits, we assume without deciding that all of the statements attributed to Marra were testimonial in nature and that their admission through Nobile violated the petitioner's constitutional right to confrontation.[10] We therefore turn to *Golding*'s fourth prong, which is dispositive of the petitioner's claim.

---

[10] In contrast to Randolph's situation as the petitioner's criminal trial counsel, by the time Stevenson had filed the direct appeal in this matter, courts had started to address whether statements made by unavailable informants violated the confrontation clause. See, e.g., *United States* v. *Casiano*, 133 Fed. Appx. 791, 794 (2d Cir. 2005); *United States* v. *Hendricks*, 395 F.3d 173, 184 (3d Cir. 2005); see also *United States* v. *Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) ("[t]his court has warned against the potential

The petitioner broadly asserts that, "[i]f Marra's statements and materials were excluded on confrontation grounds, the state's attempted murder case would have unraveled, and the sexual assault case would have been reduced to a credibility contest [between the petitioner and the victim]." The respondent contends that, aside from Marra's statements, there was other "damning evidence against the petitioner," such as the petitioner's own statements, Holeman's testimony, and information from Nobile's and Dillon's independent investigations, relevant to a harmless error analysis that would inform counsel's decision of what claims to raise. After carefully reviewing the record, we agree with the habeas court that, both with respect to the sexual assault case and the attempted murder case, any improper admission of Marra's statements constituted harmless error.

"[T]he test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . [Our Supreme Court] has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including

for abuse when police testify to the out-of-court statements of a confidential informant"). Although our Supreme Court did not address this issue until three years after the direct appeal was filed in *State* v. *Smith*, supra, 289 Conn. 622–27, because the habeas court in the present case did not address the issue, we decline to address the issue of whether *Crawford* would have still been a novel claim at the time of the direct appeal and instead address whether there was a reasonable likelihood that a *Crawford* claim relying on *Golding* review would have been successful on direct appeal to determine whether Stevenson performed deficiently in not raising such a claim.

the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Internal quotation marks omitted.) *State* v. *Tony O.*, 211 Conn. App. 496, 526, 272 A.3d 659, cert. denied, 343 Conn. 921, 275 A.3d 214 (2022).

We first turn to the attempted murder case. Marra was a significant figure in both the underlying criminal activity and Nobile's and Dillon's investigations. He provided the initial information regarding the petitioner's intent to harm the victim. Nevertheless, the confrontation clause would have limited the state's ability to present only Marra's testimonial statements as evidence and would not have affected its ability to present evidence regarding Marra's general involvement in the case. See *Crawford* v. *Washington*, supra, 541 U.S. 61 (confrontation clause applies only to testimonial statements). Mindful of this distinction between Marra's general involvement and his testimonial statements, we conclude that any improperly admitted testimonial statements were cumulative in light of all the other evidence presented at the criminal trial.

The only evidence containing Marra's statements admitted in the attempted murder case includes exhibit 14, the letter from Marra to Nobile offering information about the petitioner; exhibit 16, the transcript of Marra's phone conversation with the petitioner; exhibit 19, a letter dated August 13, 2002, from Marra to the petitioner asking for "Donna's" plate number; and the information that Nobile testified that Marra told him, including the code used by the petitioner and Marra in their

communications to identify the victim, her address, and her license plate number.

As to Marra's information about the code, the petitioner argues that, "[w]ithout Marra's explanation of the coded communications contained in the letters, the letters offered into evidence are not incriminating." The state, however, established the significance of the letters without Marra's explanation.

Both Dillon and Nobile testified that they independently ascertained the victim's address, license plate number, and her vehicle's make and model, and that the victim's identifying information appeared in the petitioner's letters. Indeed, Marra's statements to Nobile were unnecessary to decode the petitioner's rudimentary efforts to hide the identifying information about the victim in his communications with Marra. In exhibit 13, the letter from the petitioner to Marra dated September 9, 2002, the victim's address was written on the envelope, and the letter referenced a "white four-door Blazer." Given that both Nobile and Dillon knew the victim's identifying information, a plain reading of the letter made it apparent that the petitioner was conveying the victim's identifying information in those letters. Additionally, the encoding of the license plate "190RSD" as "[o]ne ninety Rose Soap Dish" in the letter was not complex, and the petitioner—not Marra—provided the explanation of his code in his recorded conversation with Marra. Thus, the petitioner's statements, not Marra's, provided a solution to the code, to the extent one was needed.

The only explanation of the "code" that originated solely from Marra was that "Donna" referred to the victim and that "Joe Black" referred to the petitioner. Although the information about the aliases was used to establish that the petitioner was writing the letters

and providing the victim's information, the state established through many different sources at trial that the petitioner was the author of the letters and that the letters contained the victim's identifying information. The petitioner referenced the letters he sent Marra during his recorded phone calls with Nobile and Marra, transcripts of which were admitted into evidence as exhibits 17 and 16, respectively. Further, Nobile's testimony that Joe Black symbolized death was based on Dillon's research suggesting that the alias was a reference to the movie, "Meet Joe Black." Similarly, the explanation of the alias "Donna" was unnecessary, given the testimony of Dillon and Nobile linking the identifying information in the letter to the victim, which removed any doubt about the identity of "Donna." Moreover, the petitioner's own affirmative reply to Nobile mentioning "Donna" during their phone call further confirmed this fact. Therefore, Marra's statements about the code were cumulative and unnecessary to the state's case, as there was an abundance of other evidence establishing the meaning of the letters.

Exhibit 14, the letter sent to Nobile from Marra in August, 2002, exhibit 19, the letter from Marra to the petitioner dated August 13, 2002, and Marra's verbal statements to Nobile and Dillon identifying the petitioner as someone who wanted a victim killed also were cumulative in light of the petitioner's own statements establishing that fact. As the habeas court concluded, "[the petitioner] himself, not Marra, provided the critical facts needed to convict him in the attempted murder case through his correspondence to Marra and his phone conversation with Nobile." In particular, letters from the petitioner to Marra, one postmarked August 8, 2002, and the other dated September 9, 2002, exhibits 12 and 13, respectively, demonstrate that the petitioner sent Marra the victim's identifying information when requested. The petitioner's statements made during his

recorded phone calls with Nobile, transcripts of which were admitted as exhibits 16 and 17, in which he acknowledged the identifying information in the letters sent to Marra, established a link between his correspondence with Marra and contracting with Nobile to be the assassin. Specifically, during his recorded phone call with Nobile on October 14, 2002, exhibit 17, the petitioner confirmed the price when prompted by Nobile, gave a time frame for the murder, and confirmed that the target was "Donna." Further, during their recorded phone call on October 18, 2002, exhibit 18, the petitioner discussed meeting with Nobile to give him some of the money. In addition, the evidence seized by law enforcement at the petitioner's residence, including Marra's contact information and information about the victim, further established the petitioner's relationship with Marra and his intent to kill the victim. Likewise, Holeman's testimony, despite the minor role that it played, provided confirmation of both Marra's relationship with the petitioner and the petitioner's intent to harm the victim.

Although the petitioner asserts in his reply brief that the state's closing argument demonstrates the state's reliance on Marra to prove the attempted murder charge, the record reflects otherwise. To be sure, Marra features prominently in the state's narration of events because he first alerted the state to the petitioner's interest in killing the victim and was the conduit who introduced Nobile to the petitioner. Nevertheless, during its closing argument, the state distinguished between Marra's involvement and Marra's statements by relying on Nobile's and Dillon's independent investigations and the petitioner's own statements and actions. For example, after describing the September 4, 2002 meeting, the prosecutor argued to the jury, "Nobile indicated that what they did is, they took this information and other information that they had gotten from

. . . Marra. The name of the victim, the address of the victim, and the other information regarding the victim and they tried to corroborate information. Because they weren't going to [accept] the word of . . . Marra." The state then explained the contents of the letters using information sourced independently by Nobile and Dillon. The prosecutor then argued that the state used the petitioner's own statements referring to the encoded information to demonstrate that "[the petitioner] shows full knowledge of what the plan is here." Consequently, we agree with the habeas court that the admission of Marra's statements with regard to the attempted murder case was harmless beyond a reasonable doubt because the petitioner's own statements and Dillon's and Nobile's independent investigations rendered Marra's statements of little value.

For these same reasons, the admission of Marra's statements in connection with the sexual assault case was harmless beyond a reasonable doubt. As discussed previously, Marra's statements about the attempted murder were cumulative of the other evidence presented. Further, evidence of the attempted murder was not the focus of the sexual assault case but was introduced primarily as consciousness of guilt evidence. The state relied on other ample evidence of the petitioner's guilt, including: (1) the victim's own testimony; (2) photos of the victim's injuries; (3) the corroboration of the victim's testimony by two witnesses; (4) the other extrinsic evidence introduced, including the victim's sweatpants with the broken drawstring; (5) the expert witness who testified that the forensic examination revealed that the victim's underwear contained the petitioner's DNA; and (6) Holeman's testimony that the petitioner described the sexual assault charge as a date that went too far. Thus, contrary to the petitioner's argument, the state's sexual assault case was based on much more evidence than Marra's statements and the

word of the victim. Against this backdrop, Marra's statements were insignificant to the overall strength of the state's case.

In sum, after a careful review of the record, we conclude that the petitioner's claim fails to satisfy *Golding*'s fourth prong due to the cumulative nature of Marra's statements and the other independent evidence of the petitioner's guilt. For this reason, we cannot conclude that Stevenson's strategic decision to forgo the *Crawford* claim was unreasonable. Moreover, even if we were to so conclude, it is clear that the petitioner was not prejudiced by Stevenson's failure to raise the *Crawford* claim because there was not a reasonable likelihood that it would have succeeded on appeal. For these reasons, the petitioner's claim that Bansley rendered ineffective assistance of counsel by not raising the *Crawford* claim as to Stevenson necessarily fails.

II

The petitioner's final claim is that Bansley rendered ineffective assistance in the first habeas by failing to argue that Randolph performed deficiently in failing to pursue a claim that the state had violated the petitioner's right to counsel pursuant to *Massiah* v. *United States*, supra, 377 U.S. 201, by using Marra to elicit incriminating statements from him. The following additional facts and procedural history, as set forth by this court in *State* v. *Santaniello*, supra, 96 Conn. App. 646, are relevant to the petitioner's *Massiah* claim.

"On July 29, 2003, the [petitioner] filed a 'request for discovery and production,' in which he requested that the state produce exculpatory information, books, papers or documents that the state intended to offer into evidence or which might be helpful to the defense, copies of the [petitioner's] criminal record, reports of experts, warrants related to the [petitioner], written or oral statements made by the [petitioner], statements of

coconspirators, names and addresses of all witnesses, statements of witnesses, felony or misdemeanor convictions of witnesses and any other relevant material and information.

"During jury voir dire on December 18, 2003, a discussion ensued related to the production of documents in which both [Randolph] and the state initially agreed that the court should conduct an in camera review of Marra's [D]epartment of [C]orrection file. The court then stated that it wanted the state to review the file first and to discuss the procedure with [Randolph]. The court explained that the state had a duty to conduct the initial review of these documents. The state agreed, and [Randolph] then told the court that he would 'indicate to the [c]ourt what it is in the file that would be of material benefit to the defense were it included in the file.' [Randolph] explained that he wanted the file reviewed for information that would benefit the [petitioner's] entrapment defense and for information indicating that Marra was an operative informant of the state on an ongoing basis. The court then, specifically to protect the record, told [Randolph] that he should make a precise written request as soon as possible as to what materials he believed might be in the state's possession and why they should be disclosed, to which [Randolph] responded: 'Certainly.' The court continued: 'I think that would be a good idea because in the event of an appeal, then there is no misunderstanding, no mistake. If you want something for truthfulness, something to establish the nature and extent of any relationship with the state, agency relationship now or ever, character evidence, whatever you want. Just put it in writing so the state knows what you want and so if I get involved in reviewing the materials, I can be aware of them.' [Randolph] then thanked the court and agreed that he would put his request in writing sooner rather than later. . . .

"On January 5, 2004, during oral argument on these motions, the court asked if [Randolph] still wanted the court to review the [D]epartment of [C]orrection documents in camera to assess whether there was 'a continuing relationship such that . . . any statements made at any [time would not be] admissible for any purpose.' [Randolph] responded: 'That's right.' The court stated that it wanted to hear further argument on these motions later in the day, and it then would determine if it needed to conduct an in camera review of documents. Later that day, [Randolph] agreed that the reason he was seeking disclosure and the court's review of these documents 'pertain[ed] to a claim that Marra at some point became an agent of the government and the statements ought to be suppressed . . . .' The court, again, explained that it was the duty of [the] state to review these documents first. [Randolph] expressly stated that the court was correct. He then stated: 'I think . . . [the prosecutor] as an officer of the court would probably disclose to me if there were [any material disclosable under *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), or *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] in the records anyway. . . . So, I don't have any concern that [the prosecutor] go through the records rather than have . . . an in camera inspection at the outset. I would agree that [the prosecutor] should have an opportunity to do that.' Following a recess, the court explained for the record that it had spoken to both counsel in chambers concerning, among other things, these motions, and the court suggested that the prosecutor review the records for exculpatory information or anything related to an agency relationship that Marra had with the government and that it would be best to 'keep the court out of the loop at this point.' Both [Randolph] and the state expressly agreed. The court also stated that in light of this, it did not need to act

on the motion for disclosure of records at this time. Again, both [Randolph] and the state expressly agreed. In relation to the motion to suppress, [Randolph] stated that if nothing in the documents revealed an ongoing agency relationship between Marra and the government, then, for purposes of this case, the agency relationship began between September 4 and 18, 2002.

"During further discussion on these motions on January 8, 2004, the prosecutor explained that he had obtained the [D]epartment of [C]orrection documents on Marra and that he had some exculpatory material as well as other material that questionably could be disclosable. The court directed the prosecutor to turn over anything that he believed the [petitioner] was entitled to obtain and that if after meeting with [Randolph] there remained questionable documents, they should be brought to chambers so that the court could inspect them. Both [Randolph] and the state agreed.

"After a recess during which the state and [Randolph] met, the prosecutor affirmed that he had turned over to [Randolph] all documents that, even arguably, could be discoverable or related to the issue of agency. Thereafter, the [petitioner] did not renew his request that the court conduct an in camera review of documents or argue that some documents had not been turned over or that the court needed to take any further action on his motion for disclosure of records. . . . [I]t appears that the issue of disclosure and the necessity for an in camera inspection had been addressed fully at this time and that the court had nothing further upon which to act related to this motion or request.

"On January 12, [2004], several days after Marra's [D]epartment of [C]orrection documents had been turned over to the [petitioner], the court heard further oral argument on the [petitioner's] motion to suppress statements that he had made to Marra. . . . [T]he court

did not rule on this motion. Rather, the state and [Randolph] agreed on the admissibility of these statements, thereby rendering the motion moot.

"During the January 12, [2004], hearing, the [petitioner] agreed that for purposes of this case, Marra had not been acting as an agent of the government prior to September 4, 2002, and that any statements made prior to that date were admissible fully. The [petitioner] also agreed that the statements he made to Marra after September 4, 2002, were admissible as to the attempted murder information, with one exception. The [petitioner] did not agree that a September 9, 2002, letter written by the [petitioner] to Marra [(exhibit 13)] was admissible. The court then concluded that the parties had reached agreement on all but one of the statements sought to be suppressed, and it stated that it would make a ruling on the admissibility of that September 9, 2002 letter later in the day. Counsel did not object.[11]

"During the testimony of Nobile later that day, the state offered the September 9, 2002 letter into evidence, and [Randolph] specifically stated that he had no objection. The court, sua sponte, immediately explained to the jury that it would have further instructions for it at

[11] Specifically, the state contended that the letter in exhibit 13, although dated September 9, 2002, was responsive to the August 13, 2002 letter from Marra to the petitioner (exhibit 19) and, therefore, was elicited by Marra prior to September 4, 2002, and could not be suppressed pursuant to *Massiah*. Randolph initially was unwilling to concede this point because "[the letter] may have been in response to a telephone call from [Marra] subsequent to September 4, 2002." No such evidence was offered during the hearing or trial. Randolph agreed with the court's suggestion to think about the issue further and for the court to address the admissibility of exhibit 13 in the sexual assault case later. Randolph further agreed with the state that exhibit 13 would be admissible in the attempted murder case and could be presented as evidence at trial. Upon the prosecutor's informing the court of his intention to introduce exhibit 13 through Nobile, the court suggested that it would inform the jury that it would give specific instructions concerning the precise nature of the letter's admissibility in the court's closing instructions. Both Randolph and the state agreed.

a later time concerning how this and other letters could be treated by the jury and for what purposes they might be considered." (Footnote added; footnotes omitted.) Id., 664–68.

Specifically, at the close of the petitioner's criminal trial, the court instructed the jury that "[a]ny statements with the exception of state's exhibit 12 made by the [petitioner] to [Marra] or [Nobile] after September 4, 2002, the date [Marra] became a person cooperating with the government for purposes of this case, may not be considered by you at all in your evaluation of the charges of sexual assault in the first degree, burglary in the first degree, and kidnapping in the first degree in docket number CR-02-122734." Exhibit 12 was admitted solely as consciousness of guilt evidence. The court also instructed the jury that exhibit 13, the September 9, 2002 letter, could be considered only as consciousness of guilt evidence in the sexual assault case.[12]

At the second habeas trial, Randolph testified about his view of the viability of a *Massiah* challenge based on Marra's having acted as an agent of the government prior to September 4, 2002, during the following exchange between the petitioner's counsel and Randolph:

"[The Petitioner's Counsel]: Alright. So, if Tommy Marra was an informant working for the state at the time he approached [the petitioner], would that be a basis to try and exclude the information reportedly gleaned by [Marra] from [the petitioner]?"

"[Randolph]: I don't think it can be argued that he was an agent working for the state. The state did not

---

[12] It follows that the court accepted the state's argument that exhibit 13 was responsive to exhibit 19, the August 13, 2002 letter, and was elicited by Marra prior to September 4, 2002. See footnote 11 of this opinion. Randolph did not raise any objections to the admission of exhibit 13 or the court's instructions thereto.

prompt, apparently, [Marra] to do anything. He initiated contact, and so I do not think those facts go to, basically, the state breaching [the petitioner's] sixth amendment right to counsel, or his fifth amendment right.''

In its memorandum of decision, the habeas court found that Randolph did not render ineffective assistance because he had raised the claim ''to the extent that he was able to rely on [*Massiah*].'' The court found that the petitioner's right to counsel in the attempted murder case did not attach until after the investigation into the attempted murder was concluded. With respect to the sexual assault case, in which the petitioner's right to counsel had attached prior to his involvement with Marra, the habeas court concluded that *Massiah* had limited application as delineated by the trial court.

In the present appeal, the petitioner claims that Randolph rendered ineffective assistance by not arguing that ''the state . . . should be deemed to have had a tacit ongoing agreement with Marra, in which Marra would provide information about any criminal defendants available to him in exchange for the promise of a potential benefit . . . .'' The petitioner asserts that, had Randolph not abandoned the *Massiah* challenge, this tacit ongoing agreement between Marra and the state would have provided a basis for the suppression of all evidence of the attempted murder plot in the sexual assault case, reducing the sexual assault case to a credibility contest between the petitioner and the victim. The respondent argues that the petitioner failed to present evidence that supports his claim.[13] We agree with the respondent.

---

[13] The respondent also contends on appeal that the record is inadequate to review the petitioner's claim that Marra had a preexisting agency relationship with law enforcement because the court relied on its determination that the petitioner's right to counsel had not yet attached in the attempted murder case. In response, the petitioner argues that this reliance means that ''the habeas court necessarily rejected the petitioner's argument that Marra was a state agent at the time of his initial approach, because, otherwise, that would have also served as a basis to suppress the material and information

The record from the petitioner's criminal trial and the habeas trial is clear that Randolph made a tactical decision not to pursue the precise *Massiah* challenge raised by the petitioner in the present case. Counsel is presumed to have made a sound strategic decision when he elected not to pursue such a challenge, unless the petitioner rebuts that presumption with sufficient evidence that counsel's decision was objectively unreasonable. See *Williams* v. *Commissioner of Correction*, 142 Conn. App. 744, 752, 68 A.3d 111 (2013). The petitioner argues that Randolph's limited approach to challenging Marra's role as a government agent was objectively unreasonable because Marra, during all of his interactions with the petitioner, was acting as an agent of the state pursuant to an implicit understanding. We are not persuaded.

"In a line of cases extending from *Massiah* v. *United States*, [supra, 377 U.S. 201], through *United States* v. *Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), to *Maine* v. *Moulton*, [474 U.S. 159, 106 S. Ct.

---

supplied by Marra . . . ." We conclude that the record is adequate to review the petitioner's *Massiah* claim.

With respect to the sexual assault case, the court found that, considering the limited use of the petitioner's statements to Marra, *Massiah* had limited application. Consequently, the court concluded that Randolph did not render ineffective assistance by raising *Massiah* in the manner that he did. On appeal, the petitioner alleges harm from the limited admission of the evidence in the sexual assault case and argues that the alleged tacit ongoing agreement between Marra and the state provided a basis for the suppression of all evidence of the attempted murder plot in the sexual assault case.

Although the habeas court did not make any factual findings as to the alleged agency relationship, it is well settled that, "to the extent that the resolution of [the issue of agency] calls for application of the controlling legal standard to the historical facts, it presents a . . . question of law . . . which [this court reviews] de novo. . . . Such a review is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Ashby*, 336 Conn. 452, 467–68, 247 A.3d 521 (2020).

477, 88 L. Ed. 2d 481 (1985)], the United States Supreme Court has held that a state violates the sixth amendment when, acting through an undisclosed agent, it deliberately elicit[s] incriminating statements from an accused after he ha[s] been indicted and his right to counsel has attached." (Internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 854–55, 847 A.2d 921 (2004). "The general nature of this constitutional duty is clear: [T]he [s]tate [has] an *affirmative obligation* to respect and preserve the accused's choice to seek [the] assistance [of counsel]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ashby*, 336 Conn. 452, 469, 247 A.3d 521 (2020).

In order to succeed on a claim that his sixth amendment right to counsel was violated pursuant to *Massiah*, the petitioner must prove the following: "(1) the [s]ixth [a]mendment right to counsel ha[d] attached; (2) the individual seeking information from the [petitioner was] a government agent acting without the [petitioner's] [counsel] being present; and (3) that agent deliberately elicit[ed] incriminating statements from the [petitioner]." (Internal quotation marks omitted.) Id., 465. Although there is no bright-line test for an agency relationship, our Supreme Court has provided guidance on determining whether such a relationship exists.

"The existence of an agency relationship . . . turns upon a number of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated . . . whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it . . . and whether the information is secured as part of a government initiated, [preexisting] plan." (Internal quotation marks omitted.) Id., 475. "[I]n the absence of any such

directive or promise, 'a trial court [correctly] may determine that an informant was not so much a government agent . . . as he was an entrepreneur who hoped to sell information to the government.' " Id., 524 (*Mullins, J.*, concurring in part and dissenting in part).

In the present case, the petitioner acknowledges that there is no evidence that the state expressly asked Marra to secure information from the petitioner. Nor is there any evidence that the state directly made any promise to Marra of a benefit if he did so. Instead, the petitioner argues that "Marra's long experience as a jailhouse informant, combined with his parallel meetings with other law enforcement personnel beyond those involved with the instant investigation, and his continued retention of the same attorney to represent him in his dealings with the state created a course of conduct from which can be inferred an implicit agency relationship between the state and Marra at the time he began providing information against the petitioner."

In particular, the petitioner relies on Nobile's testimony at the petitioner's criminal trial that he had previously accompanied another inspector to interview Marra about an unrelated homicide case, as well as Marra's documented involvement in *State* v. *Tomasko*, 242 Conn. 505, 700 A.2d 28 (1997), to demonstrate that Marra's role as a state informant was "enormous . . . ." In *Tomasko*, the defendant claimed that the state had failed to disclose audiotapes of police interviews with Marra, which the defendant argued suggested Marra's potential involvement in the victim's death. Id., 514. In resolving that claim, our Supreme Court discussed Marra's involvement with police, noting that "Marra [had] indicated that, commencing in October, 1985, he had been interviewed on several occasions by . . . various other police officials about a number of subjects"; id., 515; and that Marra "had been questioned about more than twenty homicides." Id., 516. At the underlying

habeas trial, Gailor confirmed the accuracy of the statements in *Tomasko* regarding Marra.

The petitioner argues, relying on *United States* v. *Brink*, 39 F.3d 419 (3d Cir. 1994), that, even in the absence of an express directive from law enforcement, these past interactions constituted evidence of the existence of a tacit agreement between law enforcement and Marra that would have supported a successful *Massiah* challenge as to all statements the petitioner made to Marra. In *Brink*, the United States Court of Appeals for the Third Circuit found evidence of an agency relationship where the record reflected that the inmate began to inform on other inmates in the hope of having his sentence reduced, the inmate received government training as an informant, and the inmate was told by a government agent that his cooperation would be reported to the United States Attorney and Attorney General. See id., 424. The court concluded that these facts could have led the informant to reasonably assume that the government was aware of his actions and would reward him. See id.

The present case is clearly distinguishable. Unlike in *Brink*, there is no indication that law enforcement provided any direction or instruction to Marra regarding the petitioner prior to September 4, 2002. Instead, the evidence in the present case is similar to that in *State* v. *Swinton*, supra, 268 Conn. 856, in which our Supreme Court rejected an almost identical *Massiah* claim to that made by the petitioner. In *Swinton*, the defendant claimed that a jailhouse informant "was acting as an agent throughout his interaction with the defendant because, based on his ongoing relationship with the state police, [the informant] had gathered information for the state 'in the hope and expectation of obtaining release from prison' and thus, the state 'created a situation in which incriminating statements were likely to be made.'" Id., 854. The court concluded that,

"[a]lthough [the informant] had been cooperating with the police in connection with a separate unrelated investigation and already had provided information with regard to that other investigation, this conduct did not transform him into an agent." Id., 856. The court also noted the trial court's findings that "there is no evidence whatsoever that the police had instructed [the informant] to gather information about this case, about crimes in general, or about any other case in particular, nor is there any evidence that the police had indicated to [the informant] that he would be rewarded in any way by providing information about crimes in general or about any other case in particular or about this case." (Internal quotation marks omitted.) Id., 857.

The same is true in the present case. The evidence from the petitioner's criminal trial was clear that Marra initiated contact with the state about the petitioner by sending a letter to Nobile. Furthermore, Dillon testified that he never asked Marra to collect information on the petitioner and that neither Nobile nor any other member of the Office of the Chief State's Attorney or law enforcement had done so. Marra's Department of Correction file, which was disclosed to Randolph during trial, reflects this lack of a preexisting relationship, as it exclusively contains voluntary interview statements signed by Marra and dated after September, 2002. The petitioner offered nothing to refute this evidence.

Further, although Marra clearly sought a benefit from working with the state, Nobile testified that, with respect to each of Marra's requests, the state neither promised nor provided Marra any benefit. See *State* v. *Lasaga*, 269 Conn. 454, 466, 848 A.2d 1149 (2004) (private citizen was not state agent when he neither was promised nor provided any benefit in exchange for information). Moreover, although the petitioner finds it significant that Marra was placed in a cell with a

pretrial detainee, there is no evidence that the placement was purposeful. Cf. *United States* v. *Brink*, supra, 39 F.3d 424 (finding that it was significant that, after inmate became informant for police, government placed informant in cell with pretrial detainee). To the contrary, Hall testified in the criminal proceeding that there were no records showing any request for Marra to be placed in the petitioner's cell.

Simply put, the evidence available to Randolph did not support the broad *Massiah* claim that the petitioner argues should have been made. Thus, we cannot conclude that Randolph's pursuit of his *Massiah* challenge as to the statements made by the petitioner to Marra was objectively unreasonable. Randolph raised a *Massiah* claim before the trial court to the extent he believed one was factually supported and was successful in suppressing the petitioner's statements made to Marra after September 4, 2002, in the sexual assault case, with the exception of exhibits 12 and 13, which were admitted solely as consciousness of guilt evidence. Although Randolph did not continue to pursue suppression of the petitioner's statements to Marra prior to September 4, 2002, we conclude that this decision was guided by professional judgment made after reviewing the relevant evidence, which included Marra's Department of Correction records that showed meetings with the state that occurred only after September, 2002, testimony from a Department of Correction employee explaining that there was no record of the petitioner being purposefully housed with Marra, the letter from Marra to Nobile offering information about the petitioner, and testimony by both Dillon and Nobile that reflected a lack of interaction with Marra prior to September 4, 2002. The decision to limit the *Massiah* challenge in light of this evidence therefore falls into the category of trial strategy that we consistently have declined to second-guess.

Consequently, we agree with the habeas court's conclusion that Randolph did not render deficient performance in failing to pursue a more expansive *Massiah* challenge. Accordingly, the petitioner's claim that Bansley rendered ineffective assistance of counsel by not raising a *Massiah* claim as to Randolph necessarily fails.

The judgment is affirmed.

In this opinion the other judges concurred.